

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-08-321-CV

FWT, INC.                                                                          APPELLANT

V.

HASKIN WALLACE MASON                                              APPELLEE
PROPERTY MANAGEMENT, L.L.P.

------------

FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION ON REHEARING

------------

Appellant FWT, Inc. filed a motion for rehearing and en banc reconsideration of our opinion issued on August 27, 2009. We deny FWT's motion for rehearing and en banc reconsideration, withdraw our opinion and judgment dated August 27, 2009, and substitute the following.

I. INTRODUCTION

Texas law is clear that a right of first refusal empowers its holder with a preferential right to purchase the subject property on the same terms offered

by or to a bona fide purchaser.  *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 644 (Tex. 1996).  What is less clear is whether the holder of a preferential right who desires to exercise that right can be required under certain circumstances to purchase assets that are bundled with the subject property.  This is the primary issue at the center of a dispute between FWT and Appellee Haskin Wallace Mason Property Management, L.L.P. ("Haskin Wallace").  We will affirm the trial court's orders denying FWT's motion for summary judgment, granting Haskin Wallace's motion for summary judgment, and overruling FWT's objections and special exceptions to Haskin Wallace's motion for summary judgment and response.

## II.  UNDISPUTED FACTUAL AND PROCEDURAL BACKGROUND

Greg Haskin, Russell Wallace, and Jim Mason are the owners of Haskin Wallace.  In 1990, they formed Texas Galvanizing, Inc.  Texas Galvanizing is located in Hurst and operates a "hot-dip" galvanizing plant.[1]

In 1997, FWT sold to Haskin Wallace approximately six acres of undeveloped real property ("the Property") located in Kennedale and adjacent to FWT's plant.  A Correction Warranty Deed ("Deed") identifies FWT as the

---

[1] According to Wallace, "hot-dip galvanizing is a process of applying a zinc coating to fabricated iron or steel materials by immersing the material in a bath consisting of molten zinc."  Galvanizing assists in corrosion protection of exposed steel.

2

"Grantor" and Haskin Wallace as the "Grantee"; identifies the Property as that described in an exhibit attached to the Deed, which is a metes and bounds description of the six acres; and includes the following right of first refusal in favor of FWT:

> (a) In the event Grantee desires to sell, lease or otherwise convey all or any part of the Property and shall have a bona fide offer from a third party who is ready, willing and able to purchase the Property at a price acceptable to Grantee, then Grantee shall furnish to Grantor written notice of the name of the prospective purchaser and the terms and conditions of such offer. Such notice shall be deemed to have been served and received, when mailed in the United States mail, postage prepaid, by certified mail, return receipt requested, addressed to Grantor at the following address:
>
> FWT, Inc.
> P.O. Box 8597
> Fort Worth, Tarrant County, Texas 76124
>
> *Grantor shall have 20 days after receipt of the notice in which to elect to purchase, lease or otherwise accept such conveyance, as the case may be, at the same price and under the same terms and conditions offered by the prospective purchaser.* Such election shall be exercised by written notice given by Grantor to Grantee. [Emphasis added.]

Haskin, Wallace, and Mason created U.S. Galvanizing, L.P. to operate and manage a galvanizing business to be located on the Property. A 22,500-square-foot facility designed for "hot-dip" galvanizing was constructed on the Property, and U.S. Galvanizing commenced operations in December 1998.

3

Haskin, Wallace, and Mason eventually decided to sell Texas Galvanizing and U.S. Galvanizing. FWT proposed to purchase the businesses for $15.5 million, but Haskin, Wallace, and Mason ultimately reached an agreement with Valmont Industries, Inc. for the sale of the businesses and for the lease or purchase of the Property. By letter dated December 17, 2007, Haskin Wallace notified FWT that Valmont had agreed to purchase the assets of both galvanizing businesses for $16,500,000; to lease the Property from Haskin Wallace for $25,000 per month for five years with two additional five-year options and an option to purchase the Property for $2,500,000; and to sublease from Haskin Wallace the property on which Texas Galvanizing was located. Valmont did not offer to purchase the assets of the businesses independent of the lease or purchase of the Property. According to the December 17 letter, the purchase of one "bundle of assets is contingent upon the purchase of another."

In response to the notification letter, FWT sent a letter dated December 31, 2007, to Haskin Wallace stating as follows:

> This letter is to advise you that FWT, Inc. hereby elects to exercise its right of first refusal in the Deed.

Apparently under the impression that FWT desired to exercise its preferential right and purchase the galvanizing businesses under the same terms and

4

conditions as Valmont, counsel for Haskin Wallace responded to FWT's December 31 letter and forwarded to FWT's counsel a "Closing Checklist" and a proposed closing date of January 22, 2008. The checklist identified the "Sellers" as Texas Galvanizing, U.S. Galvanizing, Haskin, Wallace, and Mason, and it listed the due dates and responsible party for various documents or items relevant to the sale of Texas Galvanizing and U.S. Galvanizing.

Thereafter, by letter dated January 8, 2008, FWT notified Haskin Wallace of the following:

> By letter dated December 31, 2007, I advised you that FWT, Inc. had elected to exercise its right of first refusal in the Deed. FWT, Inc. is ready to consummate the closing of the exercise of the right of first refusal in the Deed. Please advise me of the closing date.

In response to this letter, counsel for Haskin Wallace sent a letter to FWT's counsel stating in part that "the exercise of the Option to Purchase by a holder of a Right of First Refusal must be positive, unconditional and unequivocal and must be exercised in strict compliance with the terms of the option" and that "FWT must accept all terms of the offer or the offer will be considered rejected." Counsel for Haskin Wallace thus proposed January 18, 2008, as a closing date and stated that his clients would expect to receive good funds totaling $16,500,000 for the assets of Texas Galvanizing and U.S. Galvanizing. No closing ever occurred.

Haskin Wallace sued FWT shortly thereafter, seeking a declaratory judgment that FWT's right of first refusal was extinguished or that FWT failed to materially comply with the right of first refusal and, therefore, waived the right. FWT answered and sought a declaration in its amended counterclaim that the right of first refusal contained in the Deed "pertains solely to the sale or lease of the Property"; that FWT properly exercised its right of first refusal in the Deed; and that FWT may lease the Property at a rate of $25,000 per month for five years, elect to renew the lease under the same terms for two additional five-year terms, and elect to purchase the Property for $2,500,000. FWT also sought specific performance of its right of first refusal in the Deed and pleaded that all conditions precedent to recovery on its claim for specific performance had been performed or have occurred.

Haskin Wallace filed a motion for summary judgment on its declaratory judgment action, citing two grounds: (1) FWT's right of first refusal was waived or extinguished because FWT failed to tender performance in conformity with the terms and conditions of the "Transaction," and (2) in order to appropriately exercise the right of first refusal, FWT was required to unequivocally accept all of the terms and conditions of the "Transaction." Haskin Wallace identified the "Transaction" as Valmont's acquisition of the assets of Texas Galvanizing and U.S. Galvanizing. FWT responded and

6

specially excepted to parts of Haskin Wallace's motion. FWT also filed a motion for summary judgment, asserting that summary judgment was proper on its claim for a declaratory judgment because it properly exercised its right of first refusal in the Deed, which related solely to the Property, and that summary judgment was proper on its claim for specific performance. Haskin Wallace responded, to which FWT filed special exceptions and objections. The trial court denied FWT's motion for summary judgment, granted Haskin Wallace's motion for summary judgment, and overruled FWT's objections and special exceptions. FWT appeals.

### III. STANDARD OF REVIEW

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex. 2002); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Sw. Elec. Power Co.,* 73 S.W.3d at 215.

When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and

7

resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965). But we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005). The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action or defense as a matter of law. *Clear Creek Basin Auth.*, 589 S.W.2d at 678.

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Valence Operating Co.*, 164 S.W.3d at 661. The reviewing court should render the judgment that the trial court should have rendered. *Id*.

## IV. CONDITIONS PRECEDENT

In its first issue, FWT argues that Haskin Wallace's failure to specifically deny the occurrence of conditions precedent to specific performance bars it from claiming that its preferential right was not triggered or that it waived the

8

preferential right.[2]  FWT raises this argument for the first time on appeal. Accordingly, the argument is waived.  *See* Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); Tex. R. App. P. 33.1 (requiring that as a prerequisite for presenting a complaint for appellate review, record must show that the complaint was made to trial court by timely request, objection, or motion).  We overrule FWT's first issue.

## V.  FWT'S PREFERENTIAL RIGHT

In its second issue, FWT challenges the trial court's order denying its motion for summary judgment on its claims for a declaratory judgment and for specific performance.  FWT contends that its preferential right requires it to meet only the terms offered by Valmont with regard to the Property and that it is therefore not obligated to additionally purchase the assets of the galvanizing businesses.  It relies on a number of Texas intermediate appellate court cases that purport to support its position.  FWT claims that Texas

---

[2] ... In its first amended counterclaims, FWT alleged, "FWT pleads that all of the conditions precedent to recovery on its claim for specific performance have been performed or have occurred."  It claims that the conditions necessary for Haskin Wallace's duty to convey the Property under the preferential right in the Deed are (1) the right must be triggered and (2) FWT must exercise the right.  FWT contends that Haskin Wallace cannot argue that FWT's preferential right was not triggered or that FWT failed to properly exercise its preferential right because Haskin Wallace did not specifically deny those occurrences.

9

case law "overwhelmingly" supports its position, that "every Texas case considering whether a right of first refusal obligates its holder to purchase more than the property subject to the right [of first refusal] has rejected [Haskin Wallace's] position," and that the case law Haskin Wallace relies on is distinguishable from the facts of this case.

Haskin Wallace argues that the language in the Deed establishing FWT's preferential right required FWT to match the same terms and conditions offered by Valmont, including purchasing the assets of the galvanizing businesses, because the terms were commercially reasonable, imposed in good faith, and not designed to defeat FWT's preferential right. Haskin Wallace relies principally on a case from the Fifth Circuit Court of Appeals[3] and a number of Texas intermediate appellate court cases applying the rule expressed in the Fifth Circuit case. It contends that the cases relied on by FWT are distinguishable and thus not controlling.

There is no dispute that FWT has a valid preferential right as set forth in the Deed, that Haskin Wallace gave notice of the terms and conditions of Valmont's offer as required by the Deed, that FWT's preferential right was

---

[3] *See W. Tex. Transmission, L.P. v. Enron Corp.*, 907 F.2d 1554 (5th Cir. 1990), *cert. denied*, 499 U.S. 906 (1991).

10

triggered,[4] or that FWT gave timely notice of its desire to exercise its preferential right. Nor is there any dispute or contention by either party that the language in the Deed setting forth FWT's preferential right is ambiguous. Rather, the dispute between FWT and Haskin Wallace only concerns whether, in exercising its preferential right, FWT must either (a) *only* lease or purchase the Property under the same terms and conditions offered by Valmont *without* also purchasing the assets of Texas Galvanizing and U.S. Galvanizing or (b) lease or purchase the Property under the same terms and conditions offered by Valmont *and also* purchase the assets of Texas Galvanizing and U.S. Galvanizing.

A. Preferential Rights in General

A preferential right, also known as a right of first refusal or preemptive right, is a right granted to a party giving him or her the first opportunity to purchase property if the owner decides to sell it. *Mandell v. Mandell*, 214 S.W.3d 682, 688 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Holland v. Fleming*, 728 S.W.2d 820, 822–23 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). A preferential right has been described as a dormant option.

---

[4] Haskin Wallace argued in its response to FWT's motion for summary judgment that FWT's preferential right was not invoked, but it has abandoned that contention in this appeal. Therefore, we do not address it.

*Mandell*, 214 S.W.3d at 688 (citing *A.G.E., Inc. v. Buford*, 105 S.W.3d 667, 673 (Tex. App.—Austin 2003, pet. denied)).  Once the property owner conveys the terms of the offer to the rightholder, the rightholder then has the power to accept or reject the offer.  *Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 524 (Tex. App.—Amarillo 1998, pet. denied).  Thus, when the property owner gives notice of his intent to sell, the preferential right matures or "ripens" into an enforceable option.  *City of Brownsville v. Golden Spread Elec. Coop., Inc.*, 192 S.W.3d 876, 880 (Tex. App.—Dallas 2006, pet. denied).

The terms of the option are formed by both the provisions granting the preferential right and the terms and conditions of the third-party offer presented to the rightholder.  *Id.*; *Abraham Inv. Co.*, 968 S.W.2d at 524–25.  Once the property owner has given the rightholder notice of his intent to sell on the terms contained in the third-party offer, the terms of the option cannot be changed for as long as the option is binding on the property owner.  *Golden Spread Elec. Coop.*, 192 S.W.3d at 880.

The rightholder's exercise of the option to purchase must be positive, unconditional, and unequivocal.  *Id.*; *Tex. State Optical, Inc. v. Wiggins*, 882 S.W.2d 8, 10–11 (Tex. App.—Houston [1st Dist.] 1994, no writ).  With regard to an option, generally, a purported acceptance containing a new demand, proposal, condition, or modification of the terms of the offer is not an

12

acceptance but a rejection. *Golden Spread Elec. Coop.*, 192 S.W.3d at 880; *Tex. State Optical*, 882 S.W.2d at 11. When the rightholder gives notice of his acceptance of the offer, a contract between the rightholder and the property owner is created. *Golden Spread Elec. Coop.*, 192 S.W.3d at 880.

B. Contract Construction

Our primary concern when construing a written contract is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). We examine and consider the entire writing in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *Id.* We presume that the parties to the contract intend every clause to have some effect. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 627 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). We give terms their plain, ordinary, and generally accepted meaning unless the contract shows that the parties used them in a technical or different sense. *Heritage Res.*, 939 S.W.2d at 121.

C.     FWT's Case Law

FWT relies on five Texas cases to support its argument that it is not obligated to purchase the assets of the galvanizing businesses.  We examine each case.[5]

### 1.     *Hinds v. Madison*[6]

The Madisons owned a 14,818.63-acre tract of land.  *Hinds*, 424 S.W.2d at 62.  Out of that tract, they leased to Hinds 2,849.28 acres for a term of five years, beginning October 1, 1962, and ending October 1, 1967.  *Id*.  The leased tract was separated from the rest of the acreage by the Devil's River.  *Id*.  The lease provided that it was subject to the Madisons' right to sell the leased premises, and it gave the Madisons the right to terminate the lease on October 1 of any year by giving to Hinds six months' prior written notice of the sale.  *Id*.  The lease contained a preferential right in favor of Hinds, stating in part that "in the event of sale, lessee shall have a preference right to purchase the leased premises for such price and upon the same terms and conditions otherwise for which lessors are willing to sell to others."  *Id*.  In December

---

[5] ... FWT additionally directs us to out-of-state case law purporting to support its argument.  Like the Texas case law discussed herein, the out-of-state case law is split on the issue we consider.  *See, e.g.*, *Chapman v. Mutual Life Ins. Co. of N.Y.*, 800 P.2d 1147, 1151–52 (Wyo. 1990); *Crow-Spieker No. 23 v. Robert L. Helms Constr. & Dev. Co.*, 731 P.2d 348, 350 (Nev. 1987).

[6] ... 424 S.W.2d 61 (Tex. Civ. App.—San Antonio 1967, writ ref'd n.r.e.).

14

1966, the Madisons entered into a contract with a third party for the sale of the entire 14,818-acre tract. *Id.* The sale, however, was never consummated. Hinds sued seeking a declaration of when he could exercise the preferential right contained in the lease. *Id.* The trial court denied Hinds all relief. *Id.*

On appeal, after analyzing a number of other points of error, the court considered Hinds's argument that, according to the testimony at trial, he had a preferential right to purchase *the entire 14,818-acre tract* for the same price and under the same terms and conditions provided in the contract of sale between the Madisons and the third party. *Id.* at 64. FWT directs our attention to the *Hinds* court's lone statement addressing this argument in which the court reasoned that it did not see "how in any way lessee's option or preference right to purchase a portion of the property sought to be sold can be enlarged to cover other lands owned by lessors, or can in any manner cover anything except the property actually subject to the option." *Id.* The court cited the holding of one out-of-state case to support its conclusion. *See Atl. Ref. Co. v. Wyo. Nat'l Bank of Wilkes-Barre*, 51 A.2d 719, 722–24 (Pa. 1947) (holding that a lease of a portion of a parcel of land giving the lessee a preferential right to purchase the demised premises on the same terms of an offer by a third person does not give the lessee a right to purchase the whole parcel).

*Hinds* is the first Texas case that we have located relevant to the specific issue addressed here. There are a couple of observations worth pointing out. Hinds argued in points of error two through eight that the trial court had erred by not declaring that he had a preferential right to purchase *only* the leased premises for a price proportionate to what the Madisons had contracted to sell the entire tract of land for. *Hinds*, 424 S.W.2d at 63. Notwithstanding the money, this argument is somewhat similar to FWT's position in this case. The *Hinds* court, however, noted that there was "no evidence that lessors desired to or would sell the 2,849-acre tract alone, without selling the *whole* tract." *Id.* at 63 (emphasis added). This portion of the opinion appears to support Haskin Wallace's position in this case. After concluding that Hinds was not entitled to purchase only the leased tract of land for a particular sum of money, the court went on to state, as set out above, that Hinds could not purchase the entire 14,818-acre tract of land. The court's reasoning seems to be contradictory to a certain extent, but the portion of the opinion relied on by FWT provides support for its position that the holder of a preferential right cannot be compelled to purchase assets beyond the scope of the agreement subject to the preferential right in order to exercise that right.

16

## 2. *Riley v. Campeau Homes (Tex.), Inc.*[7]

The Rileys were assigned a lease for condominium unit 1801 at the Bayou Bend Towers from BTI, Ltd., who had leased the premises from Centeq Condominium, Ltd., who later conveyed the property to Campeau. *Riley*, 808 S.W.2d at 185. The Rileys' lease included a preferential right providing that the tenant would have the right to purchase the property if the landlord received a bona fide offer to purchase in whole or in part the leased premises. *Id.* at 186. Campeau entered into a sales contract with Advocate Equities (U.S.) Inc., Trustee for the sale of the Bayou Bend Towers, including unit 1801, and the Rileys notified Campeau that they desired to exercise their preferential right to purchase their condominium unit. *Id.* at 185. Campeau subsequently advised the Rileys that their unit was part of a larger sale of numerous properties and that it had no intention to sell it other than as part of the entire transaction with Advocate. *Id.* The Rileys demanded that their preferential right to purchase the unit be honored, but Campeau refused the demand, "asserting that [the Rileys'] right of first refusal was not applicable to this sale because it was a 'bulk' sale involving other properties." *Id.* The Rileys sued, and the trial court granted Campeau's motion for partial summary judgment. *Id.* at 186.

---

[7] 808 S.W.2d 184 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd).

On appeal, the court identified the specific issue to be resolved at the outset of the opinion, stating as follows: "The material issue in this case is whether a lessee's right of first refusal on a leased condominium is triggered when the owner decides to sell that condominium as part of a package with other condominium units." *Id.* at 185. The court held that the Rileys' preferential right to purchase unit 1801 was triggered even though the single unit was included as part of a "package" deal to purchase all of the Bayou Bend Towers units. *Id.* at 189.

*Riley* is distinguishable from this case because the issue there—whether the preferential right was triggered—is not at issue in this case; it is undisputed that the December 17, 2007 notification letter triggered FWT's preferential right.[8] *Riley* is also distinguishable from this case because Campeau ultimately withdrew the Rileys' condominium unit from the sale of the remaining condominium units. *Id.* at 186. As Haskin Wallace points out, in this case, the terms and conditions of Valmont's offer contemplate an "all or nothing" proposal. Because *Riley* did not present the specific issue that we are confronted with in this case, it is inapposite.

---

[8] The court in *McMillan v. Dooley*, 144 S.W.3d 159, 181 (Tex. App.—Eastland 2004, pet. denied), even stated of *Riley*, "The material issue in the case was whether or not the preferential purchase right was triggered by the package conveyance."

18

3.    *Comeaux v. Suderman*[9]

Comeaux leased from the Sudermans slightly less than one acre of land on the Bolivar Peninsula in Galveston County.  *Comeaux*, 93 S.W.3d at 217.  The lease included a preferential right in favor of Comeaux providing that in the event the Sudermans received a proposal to sell the leased premises, the sale was subject to Comeaux's preferential right to purchase the property on the same terms and conditions as those offered by the prospective purchaser.  *Id*.  The Sudermans subsequently notified Comeaux in writing of a pending $350,000 cash offer for the leased premises and some adjoining property to the east and west of the leased premises.  *Id*.  The notice did not specify that the total acreage to be sold was thirty-five acres.  *Id*.  Comeaux, however, apparently assumed that the sale involved only twenty-two acres surrounding his property.  *Id*. at 218.  He told the Sudermans' real estate agent that he could not afford the $350,000 payment, and he continued making payments to the new owners of the land, the Meiers, after the sale was consummated.  *Id*. Although Comeaux abandoned the leased premises when a storm destroyed his fishing pier, he later sued the Sudermans and the Meiers, asserting that he was entitled to specific performance or damages because the Sudermans had failed to comply with the terms of the preferential right contained in the lease

---

[9] ... 93 S.W.3d 215 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

19

agreement. *Id.* The trial court granted summary judgment in favor of the Sudermans. *Id.*

On appeal, Comeaux argued that his preferential right was never triggered because the written notice he received had failed to offer him the opportunity to purchase only the leased premises (rather than the entire thirty-five-acre parcel) and because the notice did not contain all the relevant terms and conditions of the sale. *Id.* at 219, 221. The court disagreed and held that Comeaux's option had expired because he received actual notice of the proposed sale of the leased premises and an opportunity to purchase it, which he declined. *Id.* at 221–23. The court stated that "because Comeaux received notice and was given the opportunity to exercise his right of first refusal, technical deficiencies in the notice—or even no notice—cannot revive the right he declined." *Id.* at 222. FWT does not rely on this, the holding of the case. Instead, it directs our attention to footnote three, in which the court addressed the appellees' argument that they were not required to give any notice to Comeaux because the sale was for more than the leased premises. *Id.* at 221 n.3. The court acknowledged that it was "unnecessary to the disposition of [the] case" to address this issue, but it cited *Riley* and stated, "A seller who has given a holder a preemptive right cannot defeat that right by selling the subject matter of that right as part of a larger transaction." *Id.*

20

*Comeaux* is distinguishable from this case because the issues there—whether the preferential right was triggered and whether Comeaux made any effort to exercise his option following his receipt of the notice of the proposed sale—are not relevant to the issue in this case.[10]  The court also expressly noted that its statement in footnote three was unnecessary to the disposition of the case.  *Id*.  The dicta statement therefore does not support FWT's position.  Because *Comeaux* did not consider the specific issue that we are confronted with in this case, it is inapposite.[11]

### 4.  *McMillan v. Dooley*

McDonald or an entity under his control owned and operated three leases from the mid-1970s until January 1998.  *McMillan,* 144 S.W.3d at 165.  The assignments by which McDonald acquired the properties were subject to farmout agreements that contained preferential rights in favor of the assignors.  *Id*. at 164–65.  In 1997, McMillan expressed interest in purchasing the Dooley Lease, one of the three leases.  *Id*. at 165.  McDonald advised McMillan that

---

[10] The *McMillan* court observed of *Comeaux*, "The holding in *Comeaux* establishes that a sufficient presentment to the rightholder occurs even though the offer includes property not covered by the preferential purchase right in the offer presented to the rightholder."  *McMillan*, 144 S.W.3d at 178.

[11] Indeed, in response to one of Comeaux's arguments, the court stated that it did not have to "address whether Comeaux should have been offered the opportunity to purchase only the leased premises."  93 S.W.3d at 221.

he was interested only in selling all of the leases as a package rather than just selling the Dooley Lease by itself. *Id*. McDonald thereafter conveyed all of the leases to McMillan without advising the preferential rightholders of McMillan's offer. *Id*. at 166. Dooley later informed McMillan of Dooley's preferential right as to the Dooley Lease, and McMillan offered to sell all of the leases to Dooley, not just the Dooley Lease. *Id*. But Dooley declined the offer because he was interested in purchasing only the Dooley Lease. *Id*. at 167. Dooley and the other preferential rightholders eventually sued McMillan after further correspondence. *Id*. at 166–68. The trial court determined that the preferential right provisions had been breached, and it granted Dooley's request for specific performance, awarding him title to the Dooley Lease. *Id*. at 169.

On appeal, the court considered many issues, including whether McMillan had adequately provided (or "presented") Dooley with an opportunity to exercise his preferential right, whether Dooley was required to accept the other leases in order to exercise his preferential right, and whether Dooley's preferential right expired when he declined McMillan's offer without taking any further action. *Id*. at 176–81. In regard to whether Dooley was required to accept the other leases in order to exercise his preferential right, the issue most relevant to the issue in this case, the court acknowledged that "[o]nly a few Texas cases have addressed the enforcement of preferential purchase rights in

22

a package conveyance," and it discussed only *Hinds* and agreed with its reasoning. *Id*. at 179. The court stated,

> Assuming the defendants had only offered Dooley the opportunity to purchase the Dooley Lease, the court's holding in *Hinds* would have prevented him from seeking to exercise his preferential purchase right against the other leases in the conveyance. If a rightholder is not permitted to expand his preferential purchase right to include property not covered by the provision, it would be improper for him to be required to accept other property not covered by his preferential right in order to exercise his right.

*Id*.[12]

There are a number of ways in which the facts of *McMillan* are distinguishable from this case. Most notably, the package deal that McMillan offered Dooley consisted of three unrelated leases. In this case, the business assets and property that FWT has been offered to purchase are significantly related; Haskin, Wallace, and Mason formed and own both Texas Galvanizing and U.S. Galvanizing, and U.S. Galvanizing sits directly on top of the Property. Moreover, in *McMillan*, there were two other rightholders making claims with regard to the other two leases that McDonald included in his offer to Dooley. In this case, there are no other competing rightholders, persons, or entities.

---

[12] The court also distinguished *West Texas Transmission*, but it did so in the context of considering "whether or not the defendants made a sufficient presentment to Dooley," which is not at issue in this case. *Id*. at 176.

5. *Navasota Res., L.P. v. First Source Tex., Inc.*[13]

Navasota had a joint operating agreement with First Source applicable to certain oil and gas interests in an area near the Navasota River. *Navasota*, 249 S.W.3d at 529. The parties referred to the property as the "Hilltop Prospect." *Id*. Navasota owned an undivided fifty-five percent working interest, and First Source owned an undivided forty-five percent working interest. *Id*. The agreement also contained a preferential right provision requiring that notice be given to the other party should a party desire to sell all or any part of its interest under the agreement and providing that the party would have ten days to purchase the interest under the same terms and conditions offered by the seller. *Id*.

Gastar, the parent company of First Source, signed a letter of intent with Chesapeake in which (a) Chesapeake would purchase 19.9 percent of Gastar's outstanding stock, (b) Chesapeake would purchase 33.33 percent of First Source's working interest in the Hilltop Prospect, and (c) Chesapeake and Gastar would enter an area of mutual interest comprising thirteen counties in East Texas. *Id*. at 530. First Source notified Navasota of the deal with Chesapeake and informed Navasota that if it elected to exercise its preferential right, it would be obligated to pay Gastar for one-third of its leasehold acreage

---

[13] ... 249 S.W.3d 526 (Tex. App.—Waco 2008, pet. denied).

in the Hilltop Interest and a percentage of drilling costs. *Id*. This notice did not require Navasota to purchase Gastar's stock or enter into the multi-county area of interest. Navasota timely notified First Source of its intent to exercise its preferential right, but First Source sent a second notice letter explaining that Navasota had to comply with *every* aspect of the agreement with Chesapeake, including additionally purchasing the stock and entering into the thirteen-county area of mutual interest. *Id*. at 531. Navasota refused to accept the modified offer, Gastar claimed that it had the right to rescind the initial "ambiguous notice," Gastar refused to close the deal with Navasota, and Gastar and Chesapeake closed their agreement. *Id*. Navasota sued, and the trial court granted Gastar's and Chesapeake's motions for summary judgment. *Id*. at 531–32.

Among numerous other issues addressed on appeal, the court considered whether First Source could require Navasota to purchase the shares of Gastar stock and to enter into the thirteen-county area of mutual interest. *Id*. at 535–37. The court stated, "Virtually every authority of which we are aware agrees that the holder of a preferential right cannot be compelled to purchase assets beyond those included within the scope of the agreement subject to the preferential right in order to exercise that right." *Id*. at 535. In support of this statement, it cited *McMillan*, *Comeaux*, and *Hinds*. *Id*. The court distinguished

25

*West Texas Transmission* and a few cases cited therein and held that First Source could not require Navasota to purchase the shares of Gastar stock or enter the thirteen-county area of mutual interest. *Id.* at 536–37.

*Navasota*, like *McMillan*, arrived at its holding on this issue by relying on *Hinds*. Also, like in *McMillan*, the assets that First Source demanded that Navasota additionally acquire were unrelated to the asset the subject of the joint operating agreement and preferential right. *Id.* at 530. Further, the court did not indicate that *West Texas Transmission* was entirely inapplicable or irrelevant to the issue; the court merely distinguished it.

D. Haskin Wallace's Case Law

Haskin Wallace relies on *West Texas Transmission* and a few Texas cases to support its argument that FWT must purchase the assets of the galvanizing businesses in addition to leasing or purchasing the Property. As we did with the authorities relied on by FWT, we examine each case.

1. *West Texas Transmission*

Valero, the predecessor of West Texas Transmission, L.P., had a preferential right to repurchase its interest in a pipeline if Enron decided to sell its interest in the line. *W. Tex. Transmission*, 907 F.2d at 1556. Enron thereafter negotiated a deal to sell all of its stock in NorTex, an affiliate, including its interest in the pipeline, to TECO Pipeline Company. *Id.* at 1557.

The agreement expressly conditioned consummation of the sale on the approval of the Federal Trade Commission. *Id.* Valero chose to exercise its preferential right to repurchase Enron's pipeline interest, but it declined to agree to the condition that the FTC approve the purchase. *Id.* at 1558. The FTC ultimately disapproved of Enron's sale to Valero and ratified the sale to TECO. *Id.* at 1559–60. Valero sued and obtained a temporary injunction, but the trial court rendered judgment in favor of Enron. *Id.* at 1561.

On appeal, the court stated that the agreement between Enron and Valero "explicitly allows Valero to reacquire the pipeline 'on the same terms and conditions as set forth in [a third-party] offer or agreement to purchase.'" *Id.* at 1562–63. The court reasoned that under that language, "[T]he terms and conditions governing Valero's repurchase remain indeterminate until Enron receives an acceptable offer from a third party." *Id.* at 1563. The court explained that under language similar to that used in the agreement between Enron and Valero, "[T]he owner of property subject to a right of first refusal remains master of the conditions under which he will relinquish his interest, as long as those conditions are commercially reasonable, imposed in good faith, and not specifically designed to defeat the preemptive rights." *Id.* Consequently, "where the owner meets these three standards, the holder of the right of first refusal lacks grounds to remove the specific conditions from the

contract, or to extract other concessions as part of the agreement." *Id.* The court held that Valero had to satisfy the condition of FTC approval because it was commercially reasonable, imposed in good faith, and not specifically designed to defeat Valero's preferential right.[14] *Id.* at 1567–68.

As the court in *Navasota* recognized, *West Texas Transmission* involved the conveyance of a single asset instead of multiple assets. *Navasota*, 249 S.W.3d at 536. However, we do not believe that this renders the case inapplicable to ours. The issue addressed by the court in *West Texas Transmission* concerned whether the holder of a preferential right must accept additional conditions included in a third party's offer. That is the same issue we consider in this appeal. The condition in *West Texas Transmission* was FTC approval; the condition in this case is the acquisition of business assets.

### 2. *Texas State Optical*

Texas State Optical had an agreement with Dr. Kernek in which Dr. Kernek purchased a retail store for the sale of eyewear and, among other things, a professional optometry practice. *Tex. State Optical*, 882 S.W.2d at 9. Texas State Optical retained a preferential right to purchase Dr. Kernek's

---

[14] The court acknowledged that "[a] different situation would exist if Valero had received an option to purchase the pipeline under terms and conditions specified in the" agreement setting forth the preferential right. *Id.* at 1568.

28

businesses if Dr. Kernek received an offer from a third party to purchase the businesses. *Id*. After Dr. Kernek's death, his wife entered into a stock sale agreement for Wiggins to purchase the stock of the businesses, and Texas State Optical notified her that it desired to exercise its preferential right to purchase the businesses. *Id*. at 10. Texas State Optical, however, reserved the right to dispute whether certain clauses of the agreement between Mrs. Kernek and Wiggins were commercially reasonable, imposed in good faith, and designed to defeat its preferential right. *Id*. These clauses included a provision giving a buyer's commission to Wiggins and a provision giving one-year employment contracts to certain employees. *Id*. Texas State Optical and Wiggins both filed declaratory judgments to determine the parties' obligations with respect to the disputed conditions of the sale, and Wiggins prevailed. *Id*.

On appeal, the court reasoned that with regard to the exercise of an option, the general rule is that the acceptance must be unequivocal; a purported acceptance containing a new demand is a rejection. *Id*. at 10–11. The court recognized, however, that it is an exception to the general rule if a seller imposes a term in bad faith to defeat the option. *Id*. at 11. It discussed the *West Texas Transmission* case and held that the trial court had abused its discretion because it did not "reach the issue of whether the disputed clauses were commercially unreasonable, or were included in bad faith to defeat [Texas

29

State Optical's] right of first refusal."  *Id*.  Significantly, the court stated, "We agree with the Fifth Circuit's conclusions in *West Texas Transmission*."[15]  *Id*. at 11.

### 3.     *Shell v. Austin Rehearsal Complex, Inc.*[16]

Austin Rehearsal Complex ("ARC") leased space in a building that ultimately came into the ownership of the Shells.  *Shell*, 1998 WL 476728, at *1.  The governing agreement contained a preferential right in favor of ARC requiring the Shells to notify ARC of a bona fide offer to lease other space in the same building in which ARC leased space and giving ARC the right to lease the property.  *Id*. at *1 n.1.  After the Shells sent ARC notice regarding a space for lease, ARC claimed that the Shells refused to lease the space to them after it had exercised its preferential right.  *Id*. at *2.  The Shells contended that ARC did not effectively exercise its option because its acceptance of the notice was conditional; ARC reserved the right to have a court determine the legality of the "Permitted Use" and "Terms and Conditions" of the offer.  *Id*. at *2, 9.  ARC sued, and a jury returned a verdict in its favor.  *Id*.

---

[15] On rehearing, one justice filed a dissenting opinion contending that *West Texas Transmission* should not be followed.  *Id*. at 12 (Cohen, J., dissenting).

[16] No. 03-97-00411-CV, 1998 WL 476728 (Tex. App.—Austin Aug. 13, 1998, no pet.) (not designated for publication).

On appeal, the Shells challenged the sufficiency of the evidence to support the jury's affirmative answer to jury question number one: "Do you find that each of the terms or conditions of the [notice of offer] (a) were imposed in bad faith, or (b) were not commercially reasonable, or (c) were reasonably designed to defeat ARC's right of first refusal?" *Id*. at *7. The court detailed the same option rules addressed in *Texas State Optical* and cited the exception set out in *West Texas Transmission*. *Id*. at *9. The court stated,

> The Shells assert that we should not adopt this exception to the general rule because the Fifth Circuit [in *West Texas Transmission*] and Houston Court of Appeals [in *Texas State Optical*] did not follow Texas law but rather created new law. We disagree. Texas courts have long recognized that the failure of the optionee to strictly comply with the terms or conditions of the option contract may be excused when such failure is brought about by the conduct of the optionor. We believe the exception stated in *Texas State Optical* is reasonable and applicable to the present case.

*Id*. (citations omitted). The court thus applied *West Texas Transmission*, and it held that the evidence was sufficient to support the jury's answer to question number one. *Id*. at *10.

E.    The Clear and Unambiguous Language of the Deed is Dispositive

Our review of the case law leads us to conclude that, as a general rule, the holder of a preferential right cannot be compelled to purchase assets beyond the scope of the agreement subject to the preferential right in order to exercise that right. *See Navasota*, 249 S.W.3d at 535; *Hinds*, 424 S.W.2d at

31

64. An exception to this rule exists, however, when the preferential right is expressly made subject to the same terms and conditions offered by a prospective, bona fide, third-party purchaser, as is the case here. In such a case, the question of whether the holder of a preferential right must purchase the additional assets turns on whether the condition that requires the purchase of additional assets is commercially reasonable, imposed in good faith, and not specifically designed to defeat the preferential right.[17] *See W. Tex. Transmission*, 907 F.2d at 1563. While this exception has been applied to cases involving the conveyance of a single asset, we have not been shown any reason why it should not apply equally to cases involving multiple assets.

In this case, FWT elected to exercise its preferential right contained in the Deed. The Deed's preferential right provision clearly and unambiguously requires that FWT meet the same price and the "same terms and conditions

---

[17] A factor to consider in determining commercial reasonableness is whether the assets as a whole are related. In *Navasota*, the bundled assets—a percentage of Gastar's outstanding stock and entry into an area of mutual interest comprising numerous counties in East Texas—were, at best, minimally related and severable from the asset the subject of the preferential right—a working interest in an area of land. 249 S.W.3d at 530. In *McMillan*, the bundle of assets that McMillan offered Dooley consisted of three separate leases. 144 S.W.3d at 166–67. In contrast, in this case, both U.S. Galvanizing and Texas Galvanizing are galvanizing businesses; both were created and are owned by Haskin, Wallace, and Mason; and U.S. Galvanizing's 22,500-square-foot facility, which is specifically designed for galvanizing, sits directly on the Property.

offered by the prospective purchaser," Valmont. *Valmont expressly conditioned its purchase or lease of the Property on its acquisition of the assets of the galvanizing businesses*; the December 17 notification letter provided to FWT states in part, "The Transaction, as contemplated by the parties, is contingent in nature and the relevant components are not mutually exclusive, meaning that the purchase of one bundle of assets is contingent upon the purchase of another, and all are contingent on the whole." Thus, FWT was required to meet the terms and conditions of Valmont's offer, including the conditions requiring acquisition of the business assets, unless those conditions were not commercially reasonable, were imposed in bad faith, or were specifically designed to defeat FWT's preferential right. *See id.*

Haskin Wallace's summary judgment evidence included the December 17 notification letter. The letter reveals that FWT itself at one point in time contemplated "an acquisition of all or a majority of the assets that now comprise the Transaction."[18] Also, in negotiating the details of the transaction, Valmont and Haskin Wallace proceeded (for over four months) under the impression that FWT's waiver of its preferential right was a "foregone conclusion." Thus, FWT's possible exercise of its preferential right likely played

---

[18] Indeed, the record reflects that FWT offered $15.5 million for the galvanizing businesses and Property.

33

little or no part at all in Valmont's decision to condition its purchase or lease of the Property on its acquisition of the assets of the galvanizing businesses. This is supported by examining the values attributed to the major parts of the transaction. The December 17 letter identifies the total value of the transaction as $19,000,000, which includes a purchase price of $12,606,000 for the assets of U.S. Galvanizing, a purchase price of $3,894,000 for Texas Galvanizing's assets, and a purchase price of $2,500,000 for the option on the Property. A large percentage of the total value of the transaction accordingly consists of the purchase price for the assets of U.S. Galvanizing and Texas Galvanizing, not the Property. Because the value of the option to purchase the Property is but a minor part of the overall value of the transaction (approximately 7.6%), it indisputably would have been both commercially and financially unreasonable for Valmont to condition its purchase or lease of the Property on its acquisition of the assets of the galvanizing businesses simply to frustrate FWT's preferential right in the Property. We hold that Haskin Wallace met its summary judgment burden to show that Valmont's conditioning its purchase or lease of the Property on its acquisition of the assets of the galvanizing businesses was commercially reasonable, imposed in good faith, and not specifically designed to defeat FWT's preferential right.

34

FWT makes no argument and points to no evidence that the parts of Valmont's offer conditioning its lease or purchase of the Property on its acquisition of the galvanizing business assets were commercially unreasonable, were imposed in bad faith, or were designed to defeat FWT's preferential right.

FWT argues on rehearing that this court has "re-written the parties' agreement for them." We disagree. FWT accepted the risk that it is now confronted with in this case because it agreed to language in the Deed allowing a third party to dictate the terms and conditions under which it would purchase or lease the Property. The parties' intent as expressed in the Deed would be circumvented if FWT is not required to purchase the bundled assets.

FWT was not entitled to judgment as a matter of law on its claims for a declaratory judgment and for specific performance. Haskin Wallace was entitled to judgment as a matter of law on its declaratory judgment action. We overrule FWT's second issue.

## VI. FWT's OBJECTIONS AND SPECIAL EXCEPTIONS

In its third issue, FWT argues that the trial court abused its discretion by overruling its objections and special exceptions to Haskin Wallace's summary judgment motion and response. FWT complains about a number of statements in Haskin Wallace's motion and response that allegedly attempt to explain the intent of the parties in negotiating and signing the Deed. FWT also complains

35

of statements that FWT was willing to waive its preferential right at various times before the December 17, 2007 notice triggered its right.

None of the complained-of statements are included in or are part of our analysis of the issues brought by FWT in this appeal, as demonstrated above. Thus, the trial court could have denied FWT's motion for summary judgment and granted Haskin Wallace's motion for summary judgment without considering the challenged statements or evidence. We overrule FWT's third issue.

## VII. CONCLUSION

Having overruled FWT's issues, we affirm the trial court's judgment.

BILL MEIER
JUSTICE

PANEL:  CAYCE, C.J.; MCCOY and MEIER, JJ.

DELIVERED:  November 25, 2009

36