02-09-205-CV














 

 

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

 

NO. 02-09-00205-CV 

 

 


 
 
 Jacqueline Rutledge Henderson
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Daniel Henderson
 
 
  
 
 
 APPELLEE 
 
 


 

 

------------

 

FROM County Court at Law No. 1
OF Parker COUNTY

------------

MEMORANDUM
OPINION[1]

----------

          In this appeal from the trial court’s
clarification and enforcement of a divorce decree, Appellant Jacqueline
Rutledge Henderson contends in her sole issue that the trial court abused its
discretion by ordering her to sign voting agreements which changed the
substantive property division of the parties’ agreement incident to divorce
(AID).  Because we hold that the trial
court abused its discretion by ordering that Jacqueline sign the voting
agreements to the extent that they modified the AID regarding Daniel’s right of
first refusal but also hold that the trial court did not otherwise abuse its
discretion, we affirm the trial court’s orders as modified.

I. 
Background Facts and Procedural History

          Daniel and Jacqueline entered into an
AID in which they divided their marital estate.  Under the AID, Jacqueline received, among
other assets, one-half of the couple’s “ownership” in nine apparently closely
held companies.  The AID provides in
relevant part, 

To the extent
permitted by law, the parties stipulate that this agreement is enforceable as a
contract.  In consideration of the mutual
undertakings and obligations contained in this agreement, the parties agree as
follows:

 

. . . . 

 

1.2     Agreement
Relating to Stock Restrictions Related to the Stock Awarded to Jacqueline . . .
.

 

          It is agreed between the parties that
although Jacqueline . . . is hereby awarded shares of stock or units in the
entities . . . , [she] hereby agrees that she will not have the right to vote
pursuant to her ownership of such stock or units.  Jacqueline . . . hereby agrees that she will
execute all documents necessary to permit Daniel . . . to exercise voting
rights relating to the shares of stock or units awarded to her herein,
including, but not limited to, limited powers of attorney or the placement of the
shares of stock into a voting trust as determined by Daniel . . . . 

 

          It is further agreed between the
parties that although Jacqueline . . . is hereby awarded shares of stock or
units in the entities . . . , [she] hereby agrees that Daniel . . . is hereby
awarded a right of first refusal to purchase the stock or units awarded herein
to [her].  Jacqueline . . . hereby agrees
that she will execute all documents necessary to confirm the right of first
refusal as provided herein.

 

          It is further agreed between the
parties that although Jacqueline . . . is hereby awarded shares of stock or
units in the entities . . . , [she] hereby agrees that such shares of stock or
units can only be sold to other current shareholders of the companies issuing
the stock or units (the shares of stock or units sought to be sold in a
particular company may only be sold to a shareholder in that particular
company).

 

          Jacqueline . . . hereby acknowledges
it is the intent of the parties pursuant to the preceding provisions that she
will have no involvement or participation in the management of any of the
companies in which she is awarded stock or units, including employment,
consulting, or otherwise.

 

          . . . . 

 

. . . . 

 

4.8     Successors
and Assigns

 

          This agreement, except as it otherwise
expressly provides, will bind and inure to the benefit of the respective
legatees, devisees, heirs, executors, administrators, assigns, and successors
in interest of the parties.

 

. . . . 

 

4.14   Agreement
Voluntary and Clearly Understood

 

Each party to this
agreement-

 

(a)     is completely
informed of the facts relating to the subject matter of this agreement and of
the rights and liabilities of both parties;

 

(b)     enters into this
agreement voluntarily after receiving the advice of independent counsel;

 

(c)     has given careful
and mature thought to the making of this agreement;

 

(d)     has carefully read
each and every provision of this agreement;

 

(e)     completely
understands the provisions of this agreement, concerning both the subject
matter and legal effect;

 

(f)      stipulates this
agreement to be a just and right division of marital debts and assets; and

 

(g)     states that this
agreement was signed without any coercion, any duress, or any agreement other
than those specifically set forth in this agreement.

 

The AID was incorporated
into the parties’ March 30, 2005 divorce decree.  No appeal was taken from that decree.

          In July 2005, Daniel sent to
Jacqueline proposed voting agreements for her shares of stock and units.  The voting agreements for the shares of stock
provide,

AGREEMENT:

NOW, THEREFORE, in
consideration of the foregoing and the mutual promises contained herein, the
Parties agree as follows:

 

1.       Voting Agreement.  JRH [Jacqueline] agrees to vote any shares of
common stock of the Corporation beneficially owned by her (the “Capital Stock”) in the manner and as
directed by DAH [Daniel].

 

2.       Irrevocable Proxy.  In connection with the voting agreement in
Section 1 above, JRH revokes any previously executed proxies and appoints DAH
as her proxy to attend shareholders’ meetings, vote, execute consents, and
otherwise act for JRH in the same manner as if she were personally
present.  This proxy is irrevocable and is coupled with an interest.

 

3.       Term.  This Agreement shall be effective as of the
date hereof and shall continue in effect for a period of fifteen (15) years
from the date hereof.

 

. . . . 

 

5.       Restrictions on Transfer; Right of
First Refusal.

 

5.1     Restrictions on Transfer.  JRH shall not assign sell, offer to sell,
pledge, mortgage, hypothecate, encumber, liquidate, dispose of or otherwise
transfer (a “Transfer”) any of the
Capital Stock of the Corporation other than in accordance with this
Agreement.  Any purported Transfer of
Capital Stock by JRH or her successors or assigns (or any successor transferee
or assignee) shall be ineffective until the transferee has agreed to become
bound as an assignee of the rights and obligations of JRH (or such successor
transferee or assignee) under this Agreement, including without limitation the
voting agreement, irrevocable proxy and Right of First Refusal set forth
herein.

 

5.2     Transfer
only to Current Shareholders. 
Pursuant to the Property Agreement, JRH agrees that the shares of the
Corporation received by JRH under the Property Agreement can only be sold to
other current shareholders of the Corporation.

 

5.3     Definitions.  As used herein, the following terms shall be
defined as follows:

 

“Proposed Transfer” means any proposed Transfer of any
Capital Stock (or any interest therein) proposed by JRH.

 

“Proposed Transfer Notice” means written notice
from JRH to DAH setting for the terms and conditions of a Proposed Transfer.

 

“Prospective Transferee” means any person to
whom JRH proposes to make a Proposed Transfer.

 

“Right of First Refusal” means the right, but
not an obligation, of DAH to purchase some or all of the Transfer Stock with
respect to a Proposed Transfer, on the terms and conditions specified in the
Proposed Transfer Notice.

 

“ROFR Notice” means written notice from DAH notifying JRH
that he intends to exercise his Right of First Refusal as to some or all of the
Transfer Stock with respect to any Proposed Transfer.

 

“Transfer Stock” means shares of Capital Stock subject to a Proposed
Transfer.

 

5.4     Grant.  JRH hereby unconditionally and irrevocably
grants to DAH a Right of First Refusal to purchase all or any portion of the
Capital Stock that JRH may propose to Transfer, at the same price and on the
same terms and conditions as those offered to the Prospective Transferee.

 

5.5     Notice.  JRH must deliver DAH a notice regarding any
proposed Transfer not later than 30 days prior to the consummation of such
proposed Transfer.  Such Proposed
Transfer Notice shall contain the material terms and conditions (including
without limitation the purchase price therefore) of the Proposed Transfer and
the identity of the Prospective Transferee. 
DAH must exercise his Right of First Refusal under this Section 5
by giving a ROFR Notice to [J]RH within fifteen (15)
days after delivery of the Proposed Transfer Notice.

 

5.6     Consideration; Closing.  If the consideration proposed to be paid for
the Transfer Stock is in property, services or other non-cash consideration,
the fair market value of the consideration shall be determined in good faith by
DAH.  If DAH cannot for any reason pay
for the Transfer Stock in the same form of non-cash consideration, DAH may pay
the cash value equivalent thereof.  The
closing of the purchase of Transfer Stock by DAH shall take place, and all
payments from DAH shall have been delivered to [J]RH, by the later of (i) the
date specified in the Proposed Transfer Notice as the intended date of the
Proposed Transfer and (ii) forty-five (45) days after delivery of the Proposed
Transfer Notice.

 

5.7     Sale by JRH; Restart of Right of First Refusal.  If any shares of Transfer Stock are not
elected to be purchased by DAH pursuant to this Section 5, then JRH shall be
free, for a period of ninety (90) calendar days from the date of the Proposed
Transfer Notice, to sell the remaining shares of Transfer Stock to the Proposed
Transferee, at a price equal to or greater than the purchase price specified in
the Proposed Transfer Notice and upon terms no more favorable to the Proposed
Transferee than those specified in the Proposed Transfer Notice.  Any transfer of the remaining shares of
Transfer Stock by JRH after the end of such ninety (90) day period or any
change in the terms of the sale as set forth in the Proposed Transfer Notice,
which are more favorable to the Proposed Transferee, shall require a new
Proposed Transfer Notice to be delivered to DAH and shall give rise anew to the
rights provided in the preceding paragraphs.

 

6.       Miscellaneous.

 

6.1     Transfers, Successors[,]
and Assigns.  The terms and
conditions of this Agreement shall inure to the benefit of and be binding upon
the respective successors and assigns of the Parties.  JRH shall not assign this Agreement in whole
or in part without the prior written consent of DAH, which may be withheld in
DAH’s discretion, and any attempted assignment without such consent shall be
void ab initio.  DAH may assign this
Agreement in whole or in part, including without limitation the Right of First
Refusal, without the consent of JRH. 
Nothing in this Agreement, express or implied, is intended to confer upon
any party other than the parties hereto or their respective successors and
assigns any rights, remedies, obligations, or liabilities under or by reason of
this Agreement, except as expressly provided in this Agreement.

 

6.2     No Fiduciary Duty.  JRH acknowledges and agrees that this
Agreement is not intended to, and shall not create, any fiduciary obligations
on the part of DAH to JRH, or any other special relationship between DAH and
JRH, with respect to voting the Capital Stock or otherwise.

 

. . . . 

 

6.6     Titles and Subtitles.  The titles and subtitles used in this
Agreement are used for convenience only and are not to be considered in
construing or interpreting this Agreement.

 

. . . . 

 

6.9     Severability.  The invalidity o[r] unenforceability of any
provision hereof shall in no way affect the validity or enforceability of any
other provision.

 

The agreements regarding Jacqueline’s units in the
limited liability companies provide,

AGREEMENT:

NOW, THEREFORE, in
consideration of the foregoing and the mutual promises contained herein, the
Parties agree as follows:

 

1.       Voting Agreement.  JRH [Jacqueline] agrees to vote any Company
Units beneficially owned by her in the manner and as directed by DAH [Daniel].

 

2.       Irrevocable Proxy.  In connection with the voting agreement in
Section 1 above, JRH revokes any previously executed proxies and appoints DAH
as her proxy to attend members’ meetings, vote, execute consents, and otherwise
act for JRH in the same manner as if she were personally present.  This
proxy is irrevocable and is coupled with an interest.

 

3.       Term.  This Agreement shall be effective as of the
date hereof and shall continue in effect for a period of fifteen (15) years
from the date hereof.

 

. . . . 

 

5.       Restrictions on Transfer; Right of
First Refusal.

 

5.1     Restrictions on Transfer.  JRH shall not assign sell, offer to sell,
pledge, mortgage, hypothecate, encumber, liquidate, dispose of or otherwise
transfer (a “Transfer”) any of Units
of the Company other than in accordance with this Agreement.  Any purported Transfer of Units by JRH or her
successors or assigns (or any successor transferee or assignee) shall be
ineffective until the transferee has agreed to become bound as an assignee of
the rights and obligations of JRH (or such successor transferee or assignee)
under this Agreement, including without limitation the voting agreement,
irrevocable proxy and Right of First Refusal set forth herein.

 

5.2     Transfer
only to Current Unitholders.  Pursuant to the Property Agreement, JRH
agrees that the Units received by JRH under the Property Agreement can only be
sold to other current unitholders of the Company.

 

5.3     Definitions.  As used herein, the following terms shall be
defined as follows:

 

“Proposed Transfer” means any proposed Transfer of any Units
(or any interest therein) proposed by JRH.

 

“Proposed Transfer Notice” means written notice
from JRH to DAH setting for the terms and conditions of a Proposed Transfer.

 

“Prospective Transferee” means any person to
whom JRH proposes to make a Proposed Transfer.

 

“Right of First Refusal” means the right, but
not an obligation, of DAH to purchase some or all of the Transfer Units with
respect to a Proposed Transfer, on the terms and conditions specified in the
Proposed Transfer Notice.

 

“ROFR Notice” means written notice from DAH notifying JRH
that he intends to exercise his Right of First Refusal as to some or all of the
Transfer Units with respect to any Proposed Transfer.

 

“Transfer Units” means Units subject to a Proposed Transfer.

 

5.4     Grant.  JRH hereby unconditionally and irrevocably
grants to DAH a Right of First Refusal to purchase all or any portion of the Units
that JRH may propose to Transfer, at the same price and on the same terms and conditions
as those offered to the Prospective Transferee.

 

5.5     Notice.  JRH must deliver DAH a notice regarding any
proposed Transfer not later than 30 days prior to the consummation of such
proposed Transfer.  Such Proposed
Transfer Notice shall contain the material terms and conditions (including
without limitation the purchase price therefore) of the Proposed Transfer and
the identity of the Prospective Transferee. 
DAH must exercise his Right of First Refusal under this Section 5
by giving a ROFR Notice to [J]RH within fifteen (15)
days after delivery of the Proposed Transfer Notice.

 

5.6     Consideration; Closing.  If the consideration proposed to be paid for
the Transfer Units is in property, services or other non-cash consideration,
the fair market value of the consideration shall be determined in good faith by
DAH.  If DAH cannot for any reason pay
for the Transfer Units in the same form of non-cash consideration, DAH may pay
the cash value equivalent thereof.  The
closing of the purchase of Transfer Units by DAH shall take place, and all
payments from DAH shall have been delivered to [J]RH, by the later of (i) the
date specified in the Proposed Transfer Notice as the intended date of the
Proposed Transfer and (ii) forty-five (45) days after delivery of the Proposed
Transfer Notice.

 

5.7     Sale by JRH; Restart of Right of First
Refusal.  If any Transfer Units are
not elected to be purchased by DAH pursuant to this Section 5, then JRH shall
be free, for a period of ninety (90) calendar days from the date of the
Proposed Transfer Notice, to sell the remaining Transfer Units to the Proposed
Transferee, at a price equal to or greater than the purchase price specified in
the Proposed Transfer Notice and upon terms no more favorable to the Proposed
Transferee than those specified in the Proposed Transfer Notice.  Any transfer of the remaining Transfer Units
by JRH after the end of such ninety (90) day period or any change in the terms
of the sale as set forth in the Proposed Transfer Notice, which are more
favorable to the Proposed Transferee, shall require a new Proposed Transfer
Notice to be delivered to DAH and shall give rise anew to the rights provided
in the preceding paragraphs.

 

6.       Miscellaneous.

 

6.1     Transfers, Successors[,]
and Assigns.  The terms and
conditions of this Agreement shall inure to the benefit of and be binding upon
the respective successors and assigns of the Parties.  JRH shall not assign this Agreement in whole
or in part without the prior written consent of DAH, which may be withheld in
DAH’s discretion, and any attempted assignment without such consent shall be
void ab initio. 
DAH may assign this Agreement in whole or in part, including without
limitation the Right of First Refusal, without the consent of JRH.  Nothing in this Agreement, express or
implied, is intended to confer upon any party other than the parties hereto or
their respective successors and assigns any rights, remedies, obligations, or
liabilities under or by reason of this Agreement, except as expressly provided
in this Agreement.

 

6.2     No Fiduciary Duty.  JRH acknowledges and agrees that this
Agreement is not intended to, and shall not create, any fiduciary obligations
on the part of DAH to JRH, or any other special relationship between DAH and
JRH, with respect to voting the Units or otherwise.

 

. . . . 

 

6.6     Titles and Subtitles.  The titles and subtitles used in this Agreement
are used for convenience only and are not to be considered in construing or
interpreting this Agreement.

 

. . . . 

 

6.9     Severability.  The invalidity o[r] unenforceability of any
provision hereof shall in no way affect the validity or enforceability of any
other provision.

 

Jacqueline refused to sign the proposed voting
agreements, so Daniel filed a petition for enforcement in December 2005,
requesting that the trial court (1) compel Jacqueline to sign the
agreements or hold her in contempt, (2) clarify any part of the divorce decree
incorporating the AID that was not specific enough to be enforced by contempt, and
(3) award attorney’s fees.

Jacqueline
filed an answer and counterpetition, arguing that Daniel failed to comply with
the AID by (1) reserving interests in the shares of stock and units awarded
Jacqueline when such interests were not agreed to in the AID or divorce decree,
(2) issuing or causing to be issued shares of stock and units bearing
restrictions, namely that the shares and units were subject to voting
agreements that would bind subsequent purchasers, and (3) eliminating in the
voting agreements the fiduciary mandates imposed on trustees by law.  Jacqueline also contended that the trial
court’s granting of Daniel’s requested relief would violate section 9.007 of
the family code by modifying the property division made in the divorce decree.  Finally, Jacqueline contended that after
receiving the “unacceptable documents” from Daniel, she had sent limited powers
of attorney for each of the nine companies for his signature, which he
refused.  Jacqueline asked that the trial
court order Daniel (1) to stop representing himself as the owner of the voting
rights to her stock shares and units, (2) to stop representing that such rights
survive the transfer of the shares and units and bind subsequent purchasers,
and (3) to assign, convey, and deliver her shares and units to her in her name “without
any restrictions thereon or on record with any Company, other than notice of
[Daniel’s] right of first refusal and that said shares and units may only be
sold to other shareholders or members.”

The trial court held hearings on February 6 and February
24, 2006.  At the February 24 hearing,
Daniel’s counsel stated,

I don’t agree with
their interpretation on the right of first refusals, but [they] raise an issue
about that.  We don’t care.  I took it out and made it an all—not that I’m
conceding the position, but to remove that issue from the case I adopted their
language and I attached a new—

 

On
March 9, 2006, the trial court signed an order finding,

1)       the following language contained in paragraph 1.2 on page 15
of 28 of the Agreement Incident to Divorce:

. . . Jacquel[ine] . . . hereby agrees
that she will execute all documents necessary to permit Daniel . . . to
exercise voting rights relating to the shares of stock or units awarded to her
herein, including, but not limited to, limited powers of attorney or the
placement of the shares of stock into a voting trust as determined by Daniel .
. . 

 

is not ambiguous and
requires Jacqueline . . . to sign and execute all documents necessary and in a
form as determined by and at the sole discretion of Daniel . . . ;

 

ordering
Jacqueline to sign within ten days the nine original voting agreements attached
to Daniel’s petition for enforcement; and awarding attorney’s fees to Daniel “through
the hearing on this matter.”

On
March 13, 2006, Jacqueline filed a petition for mandamus in this court
requesting that we compel the trial court to vacate its March 9, 2006 order and
that we stay that order pending the resolution of the original proceeding.  On March 17, 2006, we stayed the trial
court’s March 9, 2006 order; on April 24, 2006, we lifted the stay and denied
mandamus relief.

On
May 2, 2006, the trial court signed a supplemental clarification order
requiring Jacqueline to sign and deliver the nine voting agreements by 5:00
p.m. on May 3, 2006.  On May 4, 2006,
Daniel filed his first amended petition for enforcement, complaining that
Jacqueline had not delivered the nine voting agreements, seeking that she be
held in contempt and jailed until she complied with the trial court’s orders,
requesting attorney’s fees, and to the extent that the orders sought to be
enforced were not specific enough to be enforced by contempt, seeking
clarification.

          By May 5, 2006, the parties had
modified the voting agreements under a rule 11 agreement, and Jacqueline had signed
them.  The modified voting agreements
have different language concerning Daniel’s right of first refusal.  The modified voting agreements regarding the
stock provide,

5.3.    Definitions.  As used herein, the following terms shall be
defined as follows:

 

. . . .

 

“Right of First Refusal” means the right, but
not an obligation, of DAH to purchase all
of the Transfer Stock with respect to a Proposed Transfer, on the terms and
conditions specified in the Proposed Transfer Notice.

 

“ROFR Notice” means written notice from DAH notifying JRH that
he intends to exercise his Right of First Refusal as to some or all of the Transfer Stock with respect
to any Proposed Transfer.

 

. . . . 

 

5.4     Grant.  JRH hereby unconditionally and irrevocably
grants to DAH a Right of First Refusal to purchase all or any portion of the Capital Stock that JRH may propose
to Transfer, at the same price and on the same terms and conditions as those
offered to the Prospective Transferee.

 

. . . . 

 

5.7     Sale by JRH; Restart of Right of First
Refusal.  If any shares of Transfer
Stock are not elected to be purchased by DAH pursuant to this Section 5, then
JRH shall be free, for a period of ninety (90) calendar days from the date of
the Proposed Transfer Notice, to sell the remaining shares of Transfer
Stock to the Proposed Transferee, at a price equal to or greater than the
purchase price specified in the Proposed Transfer Notice and upon terms no more
favorable to the Proposed Transferee than those specified in the Proposed
Transfer Notice.  Any transfer of the remaining
shares of Transfer Stock by JRH after the end of such ninety (90) day period or
any change in the terms of the sale as set forth in the Proposed Transfer
Notice, which are more favorable to the Proposed Transferee, shall require a
new Proposed Transfer Notice to be delivered to DAH and shall give rise anew to
the rights provided in the preceding paragraphs.  [Emphasis added.]

 

The modified voting
agreements concerning the units in the limited liability companies provide,

5.3.    Definitions.  As used herein, the following terms shall be
defined as follows:

 

. . . .

 

“Right of First Refusal” means the right, but
not an obligation, of DAH to purchase all
of the Transfer Units with respect to a Proposed Transfer, on the terms and
conditions specified in the Proposed Transfer Notice.

 

“ROFR Notice” means written notice from DAH notifying JRH
that he intends to exercise his Right of First Refusal as to some or all of the Transfer Units with respect
to any Proposed Transfer.

 

. . . . 

 

5.4     Grant.  JRH hereby unconditionally and irrevocably
grants to DAH a Right of First Refusal to purchase all or any portion of the Units that JRH may propose to
Transfer, at the same price and on the same terms and conditions as those
offered to the Prospective Transferee.

 

. . . . 

 

5.7     Sale by JRH; Restart of Right of First
Refusal.  If any Transfer Units are
not elected to be purchased by DAH pursuant to this Section 5, then JRH shall
be free, for a period of ninety (90) calendar days from the date of the
Proposed Transfer Notice, to sell the remaining Transfer Units to the
Proposed Transferee, at a price equal to or greater than the purchase price
specified in the Proposed Transfer Notice and upon terms no more favorable to
the Proposed Transferee than those specified in the Proposed Transfer
Notice.  Any transfer of the remaining
Transfer Units by JRH after the end of such ninety (90) day period or any
change in the terms of the sale as set forth in the Proposed Transfer Notice,
which are more favorable to the Proposed Transferee, shall require a new
Proposed Transfer Notice to be delivered to DAH and shall give rise anew to the
rights provided in the preceding paragraphs.  [Emphasis added.]

 

Also
on May 5, 2006, Jacqueline filed her supplemental response to Daniel’s first
amended petition for enforcement.  She
discussed the rule 11 agreement, noting that she had signed the revised voting
agreements involuntarily solely to avoid being held in contempt and that she
did not waive her right to appeal, and she stated that this postdeadline
agreement would bar a contempt finding against her.

On
May 16, 2006, the trial court held a hearing.  The trial court indicated that Jacqueline
would need to sign the original voting agreements to avoid being found in
contempt and that the parties could not agree around the trial court’s order.  The parties notified the trial court in the
hearing that they were going to attempt to globally settle the property issues,
and the trial court ordered Jacqueline’s attorney to file a status report two
weeks later.

Also
on May 16, Jacqueline filed her second supplemental response to Daniel’s first
amended petition for enforcement, attaching her signed voting agreements in
their original form.  Jacqueline’s
response stated that she was signing the voting agreements in their original
form only to avoid being held in contempt and placed in jail and that she fully
intended to appeal the trial court’s order compelling her to sign the original
voting rights agreements.  No final
settlement of the property issues appears in the record.

In
early June 2006, Jacqueline attempted to appeal the trial court’s orders of
March 9, 2006 and May 2, 2006.  We
dismissed that appeal for want of jurisdiction because neither order finally
disposed of attorney’s fees.[2]  Almost three years later, on May 28, 2009,
the trial court entered a final clarification order awarding Daniel a judgment
against Jacqueline for $35,000 “for attorney’s fees through the trial of the
petition for enforcement and responding to the petition for mandamus” and conditional
amounts in appellate fees.  Jacqueline
timely appealed.

II.  Law and Analysis

Because
Daniel and Jacqueline stipulated that their AID is enforceable as a contract,
the AID’s construction is governed by contract law.  Neither party raised ambiguity below or on
appeal.  In fact, both parties agreed
below that the contract is not ambiguous, and that issue is not raised on
appeal.[3]  The trial court found that the AID is not
ambiguous, and we agree.

Accordingly,
we construe the AID as a matter of law, with our chief objective being to
determine the parties’ true intent as expressed in the document.[4]  To accomplish this task, we review the entire
AID “to harmonize and give effect to all
[its] provisions . . . so that none will be rendered meaningless.”[5]

Section
9.007 of the family code provides,

(a) A court may not
amend, modify, alter, or change the division of property made or approved in
the decree of divorce or annulment. An order to enforce the division is limited
to an order to assist in the implementation of or to clarify the prior order
and may not alter or change the substantive division of property.

 

(b) An order under this section that
amends, modifies, alters, or changes the actual, substantive division of
property made or approved in a final decree of divorce or annulment is beyond
the power of the divorce court and is unenforceable.[6]

We must therefore determine
whether the trial court’s order to sign the voting agreements in their original
form impermissibly modifies the AID, which we construe as a matter of law.

Jacqueline
complains that the voting agreements modify the AID by (1) giving Daniel the
irrevocable, fully transferable right to vote her stock shares and units even
after she sells them, binding subsequent purchasers; (2) giving Daniel a fully
transferable right of first refusal that could be exercised piecemeal; and (3)
abrogating any fiduciary duty that Daniel would have to Jacqueline concerning
his voting of her stock and units.[7]

A. 
Daniel’s Rights to Vote Shares Awarded to Jacqueline

          Jacqueline complains that the following terms in the voting
agreements regarding the stock modify the AID:

2.       Irrevocable Proxy.  In connection with the voting agreement in
Section 1 above, JRH revokes any previously executed proxies and appoints DAH
as her proxy to attend shareholders’ meetings, vote, execute consents, and
otherwise act for JRH in the same manner as if she were personally
present.  This proxy is irrevocable and is coupled with an interest.

 

3.       Term.  This Agreement shall be effective as of the
date hereof and shall continue in effect for a period of fifteen (15) years
from the date hereof.

 

Similarly, she complains
about these corresponding provisions in the voting agreements regarding the
units:

2.       Irrevocable Proxy.  In connection with the voting agreement in
Section 1 above, JRH revokes any previously executed proxies and appoints DAH
as her proxy to attend members’ meetings, vote, execute consents, and otherwise
act for JRH in the same manner as if she were personally present.  This
proxy is irrevocable and is coupled with an interest.

 

3.       Term.  This Agreement shall be effective as of the
date hereof and shall continue in effect for a period of fifteen (15) years
from the date hereof.

 

Jacqueline contends that the
AID gave her “[o]ne half of the parties’ ownership” in the companies and that
nowhere in the AID or divorce decree is Daniel given an ownership interest in
the right to vote the shares of stock or units. 
Jacqueline contends that the clear intent of the stock and unit
restrictions in the AID is to exclude her from any involvement in the businesses.  She also contends that once she sells her
stock or units in a company, any concern regarding her involvement in the
company would naturally end; therefore, she argues, 

Clearly, then, any
right granted by the AID to Daniel to exercise the vote of Jacqueline’s shares
would end when Jacqueline’s stock is sold. 
The express terms of the AID further bear this out in that the documents
listed in the relevant paragraph in the AID are limited powers of attorney and
voting trusts, both of which would terminate upon sale of the stock.

 

Yet, construing the unappealed AID to give effect to the parties’ expressed
intent, we note that the plain language of the AID does not expressly limit
Daniel’s rights to vote Jacqueline’s shares and units to her period of
ownership of the shares and units, nor does the AID provide that Daniel’s
rights to vote the shares and units terminate upon Jacqueline’s transfer of
them.  Rather, the AID expressly gives
Daniel the right “to exercise voting rights relating to the shares of stock or
units” awarded Jacqueline and provides that Jacqueline’s ownership of the
shares or units does not include the
right to vote:  “Jacqueline . . . hereby
agrees that she will not have the right to vote pursuant to her ownership of
such stock or units.”

          Further, the AID expressly provides that its terms and
conditions “shall inure to the benefit of and be binding upon the respective
successors and assigns of the Parties.”  We
therefore agree with Daniel that the AID does not provide that his rights to
vote the shares and units awarded Jacqueline somehow revest in Jacqueline so
that she can transfer unencumbered shares or units to her respective successors
and assigns.

          Finally, Jacqueline argues that the provision in the AID
requiring her to

execute all documents
necessary to permit Daniel . . . to exercise voting rights relating to the
shares of stock or units awarded to her herein, including, but not limited to,
limited powers of attorney or the placement of the shares of stock into a
voting trust as determined by Daniel . . . .

 

means that Daniel must

 

choose either (1) a limited
power of attorney, or (2) . . . a voting trust, plus whatever other documents
may be necessary to effectuate the stock restrictions. . . . The AID, thus,
intended the execution, at a minimum, of either a limited power of attorney or
a voting trust.

 

Jacqueline concludes that
because a trust and limited power of attorney would terminate upon the sale of
the affected shares or units, this provision of the AID is further evidence of
the parties’ intent that she have the ability to
transfer the voting rights to her shares and units.  Yet Jacqueline’s interpretation ignores the
broadening language of the AID provision:  “including, but not limited to.”  This we cannot do.[8]

          Accordingly, because we hold that the AID expressly gives
Daniel the right to vote Jacqueline’s shares or units, expressly provides that
Jacqueline has no voting rights regarding her shares or units, expressly
contemplates that their successors and assigns have the same rights and duties
as Daniel and Jacqueline under the AID, expressly gives Daniel the discretion
to determine which documents are necessary to allow him to exercise his voting
rights of Jacqueline’s shares and units, and does not expressly limit Daniel’s
rights to vote such shares and units to Jacqueline’s period of ownership
thereof, we hold that the voting agreements and the trial court’s order compelling
Jacqueline to sign them do not impermissibly modify the AID regarding the
voting rights.  We overrule Jacqueline’s
argument concerning the voting rights to the shares and units awarded her.

B. 
Daniel’s Fiduciary Duties to Jacqueline

Jacqueline
also complains that the voting agreements impermissibly modify the AID by
eliminating Daniel’s fiduciary duties to her regarding the voting of her stock
and units.  The plain language of the
voting agreements regarding the stock provides: 
“JRH acknowledges and agrees that this Agreement is not intended to, and
shall not create, any fiduciary
obligations on the part of DAH to JRH, or any other special relationship
between DAH and JRH, with respect to voting the Capital Stock or otherwise.”  [Emphasis added.]  And the plain language of the voting
agreements regarding the units provides, “JRH acknowledges and agrees that this
Agreement is not intended to, and shall not create,
any fiduciary obligations on the part of DAH to JRH, or any other special
relationship between DAH and JRH, with respect to voting the Units or
otherwise.”  [Emphasis added.]

Relying
on the plain language, then, the voting agreements do not address fiduciary
duties that Daniel may or may not otherwise have to Jacqueline,[9] an
issue not before us; rather, the voting agreements expressly do not enlarge any
fiduciary duties Daniel may have. 
Because the voting agreements do not limit any fiduciary duties that
Daniel otherwise has to Jacqueline, we overrule Jacqueline’s argument that the
voting agreements impermissibly modify the AID by eliminating Daniel’s
fiduciary duties to her.

C. 
Right of First Refusal

Jacqueline’s
contention that the voting agreements modify the AID by allowing Daniel to
exercise his right of first refusal piecemeal, however, has merit.  A person with a right of first refusal, also
called a preemptive or preferential right, has the right to purchase property,
shares of corporate stock and units of a limited liability company in this
case, on the same terms as a bona fide purchaser.[10]  Exercise of the right “must be positive, unconditional,
and unequivocal. . . . [G]enerally, a purported acceptance containing a new
demand, proposal, condition, or modification of the terms of the offer is not
an acceptance but a rejection.”[11]  We must narrowly construe rights of first
refusal because they restrict the free transfer of stock.[12]

The
AID provides, 

Jacqueline . . . hereby
agrees that Daniel . . . is hereby awarded a right of first refusal to purchase
the stock or units awarded herein to [her]. 
Jacqueline . . . hereby agrees that she will execute all documents
necessary to confirm the right of first refusal as provided herein.

 

The
original voting agreements regarding the stock that the trial court required
Jacqueline to sign, however, define the right of first refusal as “the right,
but not an obligation, of DAH [Daniel] to purchase some or all of the Transfer
Stock with respect to a Proposed Transfer, on the terms and conditions
specified in the Proposed Transfer Notice” and provide that “JRH [Jacqueline]
hereby unconditionally and irrevocably grants to DAH a Right of First Refusal
to purchase all or any portion of the Capital Stock that JRH may propose to
Transfer, at the same price and on the same terms and conditions as those
offered to the Prospective Transferee.” 
Similarly, the original voting agreements regarding the units that the
trial court required Jacqueline to sign define the right of first refusal as “the
right, but not an obligation, of DAH to purchase some or all of the Transfer Units
with respect to a Proposed Transfer, on the terms and conditions specified in
the Proposed Transfer Notice” and provide that “JRH hereby unconditionally and
irrevocably grants to DAH a Right of First Refusal to purchase all or any
portion of the Units that JRH may propose to Transfer, at the same price and on
the same terms and conditions as those offered to the Prospective Transferee.”

As
Jacqueline argues, in drafting the original voting agreements, Daniel has
“unilaterally translated his right of first refusal to allow him to accept or
reject that right piecemeal, . . . [i]n essence, . . .
giv[ing] himself the ability to destroy any deal Jacqueline may have to sell
her shares [or units].”  The AID gave him
no such authority.  Accordingly, because
the original voting agreements extend the reach of the right of first refusal
beyond the terms of the AID, we hold that the provisions regarding the right of
first refusal in the original voting agreements (other than those in subsection
“B” of the “Recitals” section) are void and that the trial court abused its
discretion by ordering Jacqueline to sign the original voting agreements.

We
therefore modify the trial court’s orders accordingly.[13]  Specifically, we modify the following
provisions in the March 9, 2006 clarification order:

3) the 9 documents
provided by Petitioner to Respondent on July 13, 2005 and attached as Exhibits
1 through 9 of Petitioner’s Petition for Enforcement filed with this Court on
December 13, 2005, comply with the provision contained in paragraph 1.2 on page
15 of 28 of the Agreement Incident to Divorce; 

 

. . . . 

 

IT IS THEREFORE
ORDERED that . . . Jacqueline . . . shall sign the 9 documents attached as
Exhibits 1 through 9 of Petitioner’s Petition for Enforcement . . . .

 

to now read,

 

3) the 9 documents
provided by Petitioner to Respondent on July 13, 2005 and attached as Exhibits
1 through 9 of Petitioner’s Petition for Enforcement filed with this Court on
December 13, 2005, with all provisions
regarding the right of refusal (other than those in subsection “B” of the
“Recitals” section) redacted,[14] comply with the provision contained in
paragraph 1.2 on page 15 of 28 of the Agreement Incident to Divorce;

 

. . . . 

 

IT IS THEREFORE
ORDERED that . . . Jacqueline . . . shall sign the 9 documents attached as
Exhibits 1 through 9 of Petitioner’s Petition for Enforcement, with all provisions regarding the right of
refusal (other than those in subsection “B” of the “Recitals” section) redacted.  [Emphasis
added.]

 

Similarly, we modify the
following provision in the May 2, 2006 clarification order:

IT IS THEREFORE
ORDERED that Jacqueline . . . is ordered to sign the 9 Voting Agreements
attached as Exhibits 1 through 9 to Petitioner’s Petition for Enforcement filed
with this Court on December 13, 2005 as referenced in the March 9, 200[6]
Clarification Order Pursuant to Tex. Fam. Code § 9.008 . . . . 

 

to now read,

 

IT IS THEREFORE
ORDERED that Jacqueline . . . is ordered to sign the 9 Voting Agreements
attached as Exhibits 1 through 9 to Petitioner’s Petition for Enforcement filed
with this Court on December 13, 2005, with
all provisions regarding the right of refusal (other than those in subsection
“B” of the “Recitals” section) redacted, as referenced in the March 9, 200[6]
Clarification Order Pursuant to Tex. Fam. Code § 9.008 . . . .  [Emphasis
added.]

 

III.  Conclusion

Having
held that the trial court abused its discretion by ordering Jacqueline to sign
the original voting agreements because the language regarding Daniel’s right of
first refusal did not comply with the AID but having held that the trial court
did not otherwise abuse its discretion, we affirm the trial court’s orders as
modified.

 

 

                                                                             LEE
ANN DAUPHINOT

                                                                             JUSTICE

 

PANEL: 
LIVINGTON, C.J.; DAUPHINOT and MCCOY, JJ.

 

DELIVERED:  December 2, 2010











[1]See Tex. R. App. P. 47.4.





[2]Henderson v. Henderson,
No. 02-06-00195-CV, 2006 WL 2692568, at *1 (Tex. App.—Fort Worth Sept. 21,
2006, no pet.) (mem. op.).





[3]See Praeger v. Wilson,
721 S.W.2d 597, 600 (Tex. App.—Fort Worth 1986, writ ref’d n.r.e.).





[4]See Coker v. Coker, 650
S.W.2d 391, 393 (Tex. 1983).





[5]Id. 





[6]Tex. Fam. Code Ann. § 9.007(a), (b) (Vernon 2006).





[7]Construing
Jacqueline’s brief liberally, we treat her use of “stock” alone to implicitly
include “units.”





[8]See Coker, 650 S.W.2d at 393.





[9]See, e.g., Hogget v. Brown, 971 S.W.2d 472, 487–88 (Tex. App.—Houston [14th
Dist.] 1997, pet. denied).





[10]Tenneco
Inc. v. Enter. Prods. Co., 925 S.W.2d 640, 644 (Tex. 1996).





[11]FWT, Inc. v. Haskin Wallace Mason Prop.
Mgmt., L.L.P., 301 S.W.3d 787, 794 (Tex. App.—Fort Worth 2009, pet. denied)
(op. on reh’g).





[12]Tenneco, 925 S.W.2d at
646.





[13]See, e.g., In re S.A.D.S.,
No. 02-09-00302-CV, 2010 WL 3193520, at *4 (Tex. App.—Fort Worth Aug. 12, 2010,
no pet.) (modifying conservatorship order that
varied from mediated settlement agreement and affirming as modified); Garcia-Udall v. Udall, 141 S.W.3d 323,
332 (Tex. App.—Dallas 2004, no pet.) (modifying order
modifying divorce decree to comport with mediated settlement agreement and
affirming as modified).





[14]We
note that the provisions in the AID regarding Daniel’s right of first refusal
remain intact.