

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00183-CV

_____

SANA HEALTHCARE CARROLLTON, LLC D/B/A CARROLLTON REGIONAL
MEDICAL CENTER, Appellant

V.

METROCREST HOSPITAL AUTHORITY, Appellee

On Appeal from the 431st District Court
Denton County, Texas
Trial Court No. 24-0056-431

Before Kerr, Womack, and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

This contract dispute boils down to a single question: Did either of the two communications sent by Appellant Sana Healthcare Carrollton, LLC (d/b/a Carrollton Regional Medical Center) constitute a valid exercise of its contractual option to purchase Appellee Metrocrest Hospital Authority's property? Sana claims the answer is yes; Metrocrest claims it is no. The trial court agreed with Metrocrest, so it granted Metrocrest's traditional motion for summary judgment and dismissed Sana's breach of contract claim. In Sana's dispositive appellate issue, it argues that this summary judgment ruling was erroneous and that it was premised on a misinterpretation of the parties' contract.

That contract—a lease (the Lease)—contained two purchase option provisions: one in the body of the Lease (the Lease Provision) and another in an incorporated exhibit (the Exhibit Provision). According to Sana, the trial court read the two Provisions as "two paths" for exercising the purchase option when, in fact, the Provisions "are consistent" with one another and should have been "[r]ead in harmony" to form a single "integrated" option that Sana's communications satisfied.

But the Lease and Exhibit Provisions are far from "consistent"; they have different start dates, different expiration dates, and different scopes. And short of a Frankenstein-like melding of the two, there is no rational interpretation that would render Sana's actions a valid exercise of its purchase option. For this reason—in

2

addition to Sana's failure to challenge all of the grounds for the summary judgment ruling—we affirm.[1]

## II. BACKGROUND

Metrocrest owned the Carrollton Regional Medical Center, an Imaging Center, and a set of parking areas—three properties that, collectively, the parties and Lease referred to as "the Hospital." And Metrocrest also owned several related medical office buildings (MOBs) on the same plat of land.[2] In 2019,[3] it leased some of this property to Sana and gave Sana a purchase option.

---

[1]In addition to Sana's breach of contract claim, it pleaded claims for money had and received and unjust enrichment. Metrocrest, in turn, counterclaimed for a declaratory judgment and to quiet title. The trial court dismissed all of these claims after a series of partial summary judgment motions, but the parties do not challenge those rulings on appeal. Indeed, the argument portion of Sana's brief makes no mention of its claims for money had and received or unjust enrichment, and Metrocrest did not file a notice of appeal at all. We affirm these unchallenged portions of the judgment. *See Jacobs v. Satterwhite*, 65 S.W.3d 653, 655 (Tex. 2001) (holding court of appeals erred by reversing unchallenged portion of judgment); *Bass v. Bogle*, No. 03-23-00319-CV, 2024 WL 3446921, at *7 (Tex. App.—Austin July 18, 2024, no pet.) (mem. op.) (highlighting and affirming unchallenged portions of judgment).

[2]Sana later asserted that it did not know the MOBs were on the same plat until 2023 when it attempted to secure financing for its purchase of the Hospital.

[3]The Lease was signed on November 19, 2019, but its recitals stated that it was "dated as of October 20, 2019, and effective as of February 29, 2020." Nevertheless, the body of the Lease also defined "Effective Date" as "January 1, 2020."

## A. The Lease

The Lease contained two purchase option provisions: the Lease Provision and the Exhibit Provision.

The Lease Provision stated that Sana would have "the right to purchase the Hospital and the four medical office buildings on campus (the 'MOBs') at any time during the first three years of the Lease Term." The "Lease Term" was expressly defined as "five (5) years beginning January 1, 2020 and ending December 31, 2025." The total purchase price was set at $31 million—"$16,000,000.00[] for the Hospital and . . . $15,000,000.00[] for the MOBs"—and "[t]he [p]urchase [o]ption on the MOBs [could] only be exercised if the Hospital [wa]s also or ha[d] previously been purchased."

In addition, the Lease Provision expressly referenced a "Purchase Option Agreement"—i.e., the Exhibit Provision—which the Lease stated was "executed together with th[e] Lease[,] . . . [wa]s attached [t]hereto as [an exhibit]," and was "incorporated [t]herein for all purposes."

But while the Lease Provision referenced the Exhibit Provision, the Exhibit Provision did not reference the Lease Provision. The Exhibit Provision duplicated many of the Lease Provision's terms. It redeclared abbreviations and acronyms—

4

from "Sana Healthcare Carrollton, LLC (the 'SANA')" to "right of first offer[4] ('ROFO')"—and it reiterated substantive terms that the Lease Provision had already set forth, such as

- the initial Option Fee's[5] being $1,000,000;

- the "Option Fee['s] [being] credited towards the Purchase Price" if closing occurred by a certain date;

- the total purchase price's being $31,000,000, "defined as . . . Hospital Purchase Price: . . . $16,000,000 . . . and MOB Purchase Price: . . . $15,000,000"; and

- Sana's being "required to deliver to [Metrocrest] a minimum of three (3) months['] prior written notice of its intent to exercise the [p]urchase [o]ption."

But the Exhibit Provision flatly contradicted other aspects of the Lease Provision:

- The Lease Provision identified the beginning of the Lease Term—January 1, 2020—as the start date for Sana's exercising its purchase option. The Exhibit Provision, meanwhile, stated that it was "effective on February 29, 2020," but defined an "Option Period" beginning on "execution" of the Exhibit Provision—November 20, 2019.[6]

---

[4]The Lease Provision gave Sana a "right of first offer" to "purchase the Hospital and MOBs" if Metrocrest decided to sell them "[a]fter expiration of the [p]urchase [o]ption and continuing through the end of the Lease Term."

[5]The Lease Provision labeled this $1,000,000 payment as the "Purchase Option Payment."

[6]Like the Lease, the Exhibit Provision contained internal inconsistencies regarding its date. *See supra* note 3. The Exhibit Provision stated that it "[wa]s entered into on November 19, 2019, and effective on February 29, 2020," but later, it defined "the 20th day of November, 2019 [as] (the 'Effective Date')." [Capitalization altered.]

5

- The Lease Provision stated that it would expire at the end of "the first three years of the Lease Term," i.e., on December 31, 2022. But the Exhibit Provision stated that the option period "expire[d] on December 31, 2023"—a full year later.

- The Lease Provision contemplated Sana's being able to purchase "the Hospital"—which, again, included the Carrollton Regional Medical Center, Imaging Center, and associated parking areas—separately from the MOBs. The Exhibit Provision, in contrast, did not contemplate a piecemeal purchase. The Exhibit Provision provided a purchase option for "the Property" as a whole, and it defined "the Property" to "collectively" include "the Hospital[7] . . . and four (4) Medical Office Buildings . . . located on the campus contiguous to the Hospital . . . together with the land described in [an attachment to the Exhibit Provision]."[8]

- The Lease Provision stated that Metrocrest would retain the $1,000,000 option fee "[i]f the [p]urchase [o]ption [wa]s not consummated within three years of the [undefined] Lease Commencement Date, unless [the lack of consummation was] due to the default of [Metrocrest]." The Exhibit Provision, in turn, expressly stated that the option fee was "a non-refundable payment" but would be "credited towards the Purchase Price of the Property if purchase during the Option Period."

- The Lease provided that "[a]ll notices required . . . to be given by [Sana] . . . pursuant to th[e] Lease"—including those notices required by the Lease Provision—were to be mailed to Metrocrest at a certain mailing address in Carrollton and designated for the CEO's attention. But the Exhibit Provision stated that "Notice to [Metrocrest]" was to be sent directly to the CEO at a specific suite at the same Carrollton address.

- Both the Lease and the Exhibit Provision required Sana to send "copies" of its notices to a named attorney—Michael Collins—and the Lease provided the

---

[7]Unlike the Lease, the Exhibit Provision did not clarify whether the term "Hospital" encompassed the Imaging Center and parking areas.

[8]Although Metrocrest supported its traditional summary judgment motion with a copy of the Lease—including the Lease's exhibits—the Exhibit Provision's referenced attachment was not included in any of the summary judgment evidence.

6

attorney's email address and mailing address. However, the Exhibit Provision listed only the attorney's mailing address; it did not provide his email address.[9]

The parties executed the Lease Provision on November 19, 2019, and they executed the Exhibit Provision the next day, on November 20, 2019. And, again, the Exhibit Provision was fully incorporated into the Lease for all purposes.

## B. Sana's Two Attempts to Exercise Its Option

The Lease Provision's expiration date for exercising the purchase option and closing the sale (December 31, 2022) came and went without incident.

But in May 2023—before the Exhibit Provision's option period expired—Sana's CEO sent Metrocrest's CEO a brief email stating, "This correspondence serves to notify Metrocrest . . . of [Sana's] intent to exercise the option for the hospital real estate (Carrollton Regional Medical Center)." The email indicated that "CRMC[10] intend[ed] to complete the purchase within ninety days from this date (September 1, 2023)" and intended "to exercise its option for the medical office building soon."

---

[9]Additionally, the Lease Provision stated, "[C]losing of the purchase under the [p]urchase [o]ption must take place within three years of the [undefined] Lease Commencement Date." The Exhibit Provision did not state whether closing—or some other action—was required to occur before the option's "expir[ation]"; it stated only that the option fee would be credited "towards the Purchase Price of the Property if purchased during the Option Period."

[10]"CRMC" was not defined but appears to be an acronym for the Carrollton Regional Medical Center, which is both Sana's dba and a portion of the Hospital property.

7

Nothing in the email identified the scope of the "hospital real estate (Carrollton Regional Medical Center)" that Sana intended to purchase. It was unclear whether the email's mention of the "Carrollton Regional Medical Center" intentionally excluded the other components of the Hospital (the Imaging Center and parking areas); whether the "real estate" reference was to "the land described in [the attachment to the Exhibit Provision]"; whether Sana's intent was to purchase "the medical office building soon" enough to be included in the same transaction with the Hospital; and whether the reference to a singular "medical office building" reflected Sana's desire to purchase just one or more of the four MOBs. Nothing in the email acknowledged that Sana's intent to "complete the purchase within ninety days from this date (September 1, 2023)" might run afoul of the Lease and Exhibit Provisions' required "minimum of three months['] prior written notice."[11] Nothing indicated that the email had been mailed to Metrocrest's CEO at the business's Carrollton address, as both the Lease and the Exhibit Provision required.[12] And nothing indicated that a copy of the email had been provided to Michael Collins. Regardless, no sale occurred within ninety days of Sana's email.

---

[11]For example, nothing indicated whether "this date" referred to the date the email was sent—May 23, 2023—or to September 1, 2023.

[12]Although the Lease contemplated the parties' furnishing "other addresses" for their designated notice recipients, there is no indication that Metrocrest had furnished an alternate address.

Then, at the end of September 2023—three months and one day shy of the Exhibit Provision's option period expiring—Sana sent a letter to Metrocrest in another attempt to exercise its purchase option. This time, the letter was addressed to Metrocrest's "Chief Executive Officer" at the Carrollton location, and it was copied to Michael Collins's email. The letter stated that Sana was exercising its "option and right to purchase the Hospital (the Hospital including for all purposes, as provided in the Lease, the Carrollton Hospital, the Imaging Center[,] and all parking areas identified in the parking lease attached to the Lease)" for $16,000,000. But the letter included caveats as well: (1) that "[t]he closing of the sale/purchase of the Hospital [had to] occur concurrently with the completion by [Metrocrest], at [Metrocrest's] sole cost and expense, of all actions necessary to convey the Hospital to [Sana] separate from the MOBs, including any necessary replatting of the Hospital and MOBs"; and (2) that Sana was "reserv[ing] its rights with respect to purchasing the MOBs at a later date."

The letter did not clarify where Sana believed the replatted property lines would need to be drawn or what real estate acreage Sana believed it would be purchasing after the "necessary replatting" was completed. Nor did Sana's letter identify the contractual basis for its requiring Metrocrest to replat the property at its sole expense. Nor did Sana identify the contractual basis for its reservation of "rights with respect to purchasing the MOB[]s at a later date"—a "later date" that would necessarily be after the option period's expiration given the three-months'-notice requirement.

9

Metrocrest did not consider the letter to be a valid exercise of Sana's purchase option, so, again, no sale occurred.

## C. Litigation

Soon after the Exhibit Provision expired, Sana sued Metrocrest for, among other things, breach of contract. Metrocrest moved for a traditional summary judgment on the contract claim, challenging the performance element of Sana's claim and arguing that Sana "d[id] not strictly comply with the terms" of the Lease's purchase option.[13] Specifically, Metrocrest asserted that the Lease Provision expired at the end of 2022 and that the Exhibit Provision did not allow Sana to purchase the property piecemeal, so regardless of which Provision controlled, Sana had not validly exercised its option when it proposed a piecemeal purchase in 2023. Metrocrest identified other defects in Sana's communications as well; it pointed out that Sana's email was ambiguous regarding the scope of property it wanted to purchase and that Sana's letter had conditioned the purchase on a replatting and reservation of rights that the Lease did not require or permit. Sana responded with a cross-motion seeking a traditional summary judgment in its favor on the same breach of contract claim.[14]

---

[13]Metrocrest argued that the Exhibit Provision was a modification of the Lease Provision because, it claimed, the parties had "entered into the [Exhibit Provision] the next day" after entering into the Lease. However, Metrocrest also argued that, even if the Exhibit Provision did not modify the Lease Provision, Sana's actions did not constitute a valid exercise of its option under either Provision.

[14]Sana's motion also sought summary judgment on other claims and defenses not relevant to this appeal. *See supra* note 1.

The trial court granted Metrocrest's traditional motion for summary judgment without specifying a basis for its ruling. But at a subsequent hearing, the trial court verbalized how it interpreted the Lease and Exhibit Provisions. It opined that the Lease "provided two different paths": the Lease Provision allowed Sana to purchase "the hospital and the medical office building, a choice of only one or both," while the Exhibit Provision—"path two"—"defin[ed] the property jointly" without "an option to buy only the hospital."

The trial court's verbal statements were not included in its written summary judgment order, though. Nor were such statements included in the trial court's subsequent final judgment, from which Sana appeals.[15]

### III. DISCUSSION

In its dispositive first issue, Sana challenges the trial court's summary judgment ruling on its breach of contract claim.[16]

---

[15]While this appeal was pending, we stayed "[a]ll eviction, forcible detainer, and possession proceedings involving the Carrollton Regional Medical Center."

[16]Sana lists three appellate issues, all of which relate to its breach of contract claim. It asserts that the trial court erroneously granted summary judgment on that claim (1) based on a misinterpretation of the Lease; (2) alternatively, because the Lease is ambiguous; and (3) because it excluded certain summary judgment evidence which, Sana claims, provided "context[]" regarding the parties' understanding of the purchase option. Because Sana's second and third issues rely on a determination that the Lease is ambiguous, we need not reach them. *See* Tex. R. App. P. 47.1; *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022) ("Extrinsic evidence cannot be used to create ambiguity within a contract, but it may be admitted if the court determines that the contract is ambiguous."); *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019) (noting that, "while surrounding circumstances may

11

## A. Standard of Review

Generally, when both parties move for traditional summary judgment on the same claim—as they did here—we review the cross-motions de novo and render the judgment that the trial court should have rendered. *Rosetta Res. Operating*, 645 S.W.3d at 218; *MVP Fort Worth Taylor, LLC v. Roy*, No. 02-23-00060-CV, 2024 WL 3529432, at *5 (Tex. App.—Fort Worth July 25, 2024, no pet.) (mem. op.); *see Healy Law Offs., P.C. v. Troutmen*, No. 12-24-00350-CV, 2025 WL 3724365, at *3 (Tex. App.—Tyler Dec. 23, 2025, no pet.) (mem. op.). Each movant has the burden to show that no material fact issue exists and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c);[17] *see Rosetta Res. Operating*, 645 S.W.3d at 218.

In this case, Metrocrest sought to show its entitlement to judgment as a matter of law by conclusively negating an essential element of Sana's breach of contract claim. *See* Tex. R. Civ. P. 166a(b), (c); *Healy Law Offs.*, 2025 WL 3724365, at *3. Of the claim's four elements—(1) the contract's existence, (2) the plaintiff's performance

---

inform the meaning of the words the parties chose to effect their accord even when a contract is unambiguous, courts may not rely on evidence of surrounding circumstances to make the language say what it unambiguously does not say or to create an ambiguity" (internal quotation marks omitted)).

[17]In late February 2026, the Texas Supreme Court amended Rule 166a. *See* Sup. Ct. of Tex., *Final Approval of Amendments to Rule 166a of the Texas Rules of Civil Procedure*, Misc. Docket No. 26-9012 (Feb. 27, 2026). But the "amendments apply only to a motion for summary judgment filed on or after March 1, 2026," *id.*, so they are inapplicable here. All citations to Rule 166a reference the prior version of the Rule, which continues to govern motions for summary judgment filed before March 1, 2026.

or attempted performance, (3) the defendant's breach, and (4) the resulting damages—Metrocrest's motion targeted the second element: Sana's performance or attempted performance. *See Pathfinder Oil & Gas*, 574 S.W.3d at 890 (listing elements of breach of contract).

Because the trial court did not specify a basis for its order granting Metrocrest's motion for summary judgment, we must affirm if there was any legal basis raised in Metrocrest's motion that supports the judgment. *Rosetta Res. Operating*, 645 S.W.3d at 226–28; *Artuso v. Town of Trophy Club,* No. 02-20-00377-CV, 2021 WL 1919634, at *2–4 (Tex. App.—Fort Worth May 13, 2021, no pet.) (mem. op.).

## B. Analysis

Sana attributes the trial court's summary judgment ruling to its verbal statements regarding the Lease's "two paths," and it argues that this interpretation of the Lease was erroneous. According to Sana, the Lease and Exhibit Provisions "are consistent" with one another, and "[t]he trial court failed to harmonize [the] Lease[ Provision] with [the] . . . Exhibit [Provision], instead holding that the separate documents created two different purchase options." Sana contends that, had the trial court properly construed the Lease and Exhibit Provisions "as one integrated option," it would have concluded that Sana's communications were valid exercises of that option.

But Sana's argument has two independently fatal flaws.

**1. The trial court's verbal statements did not limit the legal grounds for its ruling, and Sana does not challenge any other legal grounds.**

First, the trial court's verbal statements regarding "two paths" did not limit the legal grounds for its ruling.

The verbal statements were made at a post summary judgment hearing; they were not part of the trial court's summary judgment order or final judgment. And "we may only look to the order granting summary judgment to determine the trial court's reasons for its rulings." *Artuso,* 2021 WL 1919634, at *3 (noting appellant's misplaced "reli[ance] on the trial court's oral pronouncements" when summary judgment order did not specify a basis for the judgment); *Miller v. El Campo Holdings LLC*, No. 02-15-00388-CV, 2017 WL 370936, at *4 (Tex. App.—Fort Worth Jan. 26, 2017, no pet.) (mem. op.) (noting that the appellant did not "cite any case . . . in which a court held that oral statements made by the parties or the trial court . . . govern the scope of grounds upon which the trial court could have granted summary judgment over an otherwise unlimited order" and clarifying that "Texas courts have reached the opposite conclusion"); *cf. Gunn v. Sandalwood Mgmt. Inc.*, No. 02-23-00254-CV, 2024 WL 2202019, at *2 (Tex. App.—Fort Worth May 16, 2024, pet. denied) (mem. op.) (recognizing in review of Rule 91a dismissal that "[a] written order that does not specify grounds controls over any oral pronouncement made by the court during the hearing"). Because the trial court's summary judgment order did not specify the basis for its ruling, we may—indeed, must—affirm on any legal basis raised in Metrocrest's

14

motion. *See Rosetta Res. Operating*, 645 S.W.3d at 226; *Madhu Lodging Partners, LP v. AmGuard Ins.*, No. 02-23-00379-CV, 2024 WL 2760482, at *1–2 (Tex. App.—Fort Worth May 30, 2024, pet. denied) (mem. op.); *Artuso,* 2021 WL 1919634, at *2–4.

Yet, Sana's singular focus on the trial court's verbal statements distracts it from addressing the other legal grounds that were raised in Metrocrest's motion—even though the trial court's ruling could have been based on any of those grounds. For example, Metrocrest's summary judgment motion argued that—regardless of whether the email or letter were timely—Sana's communications were not valid exercises of the purchase option because Sana's email failed to identify the property that it sought to purchase and Sana's letter conditioned the transaction on a replatting and reservation of rights not contemplated by the Lease or Exhibit Provisions.[18] Sana's opening brief does not address these alleged defects at all.[19] And, again, "we must affirm a summary judgment if any ground on which the judgment could have been

---

[18]On appeal, Metrocrest asserts that there is another unchallenged basis for the trial court's ruling: Metrocrest's argument that Sana was not ready, willing, or able to purchase the property. But Metrocrest did not raise this argument in its traditional summary judgment motion; it raised the issue in its summary judgment reply. And "new grounds for summary judgment asserted by a movant in a reply to a summary[ ]judgment response are not properly considered on appeal." *Miller v. Great Lakes Mgmt. Serv., Inc.*, No. 02-16-00087-CV, 2017 WL 1018592, at *5 n.8 (Tex. App.—Fort Worth Mar. 16, 2017, no pet.) (mem. op.) (declining to address grounds argued on appeal but first raised in appellee's summary judgment reply).

[19]Sana course-corrects in its reply brief by addressing some of these summary judgment arguments. But "an appellant may not raise new issues in its reply brief." *Madhu Lodging Partners*, 2024 WL 2760482, at *2 n.5.

15

based stands unchallenged—'regardless of the merits of the unchallenged ground[s].'" *Madhu Lodging Partners*, 2024 WL 2760482, at *2 (affirming summary judgment on unchallenged grounds); *see Rosetta Res. Operating*, 645 S.W.3d at 226–28 (holding court of appeals erred by reversing summary judgment on certain claims when appellant failed to challenge all grounds for the judgment); *Artuso*, 2021 WL 1919634, at *3–4 (affirming summary judgment on unchallenged grounds when appellant focused on grounds verbally enunciated by trial court and noted on docket entry but summary judgment order did not specify a basis). Thus, we could uphold the summary judgment on this basis alone.

But we need not do so because we can—and do—affirm on the merits as well.

**2. Sana's actions were not a valid exercise of its purchase option.**

Whatever the trial court's interpretation of the Lease and Exhibit Provisions, no coherent interpretative theory exists under which Sana's actions constituted a valid, strictly compliant exercise of its purchase option.

It is "a well-settled principle" that "acceptance of an option must be unqualified, unambiguous, and strictly in accordance with the terms of the agreement." *Healy Law Offs.*, 2025 WL 3724365, at *5–7 (affirming summary judgment ruling based on appellant's untimely exercise of purchase option); *see Levu GP, LLC v. Pacifico Partners LTD*, No. 05-16-01167-CV, 2018 WL 4039638, at *3–5 (Tex. App.—Dallas Aug. 23, 2018, pet. denied) (mem. op.) (affirming trial court's conclusion that appellant's attempt to exercise purchase option was not strictly

16

compliant with contract terms). "With regard to an option, generally, a purported acceptance containing a new demand, proposal, condition, or modification of the terms of the offer is not an acceptance but a rejection." *FWT, Inc. v. Haskin Wallace Mason Prop. Mgmt., L.L.P.*, 301 S.W.3d 787, 794 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g) (construing preferential right to purchase); *see Besteman v. Pitcock*, 272 S.W.3d 777, 784 (Tex. App.—Texarkana 2008, no pet.) (reviewing purchase option and noting that "[a]ny failure to exercise an option according to its terms, including an untimely or defective acceptance, is simply ineffectual").

To determine what the terms of the purchase option required, we look to the plain language of the Lease and incorporated Exhibit Provision, reading the document as a whole and presuming that the parties intended every provision to have effect. *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023); *Rosetta Res. Operating*, 645 S.W.3d at 219; *FWT*, 301 S.W.3d at 794; *see Pathfinder Oil & Gas*, 574 S.W.3d at 888–89 (reiterating that "[a] contract's plain language controls, not what one side or the other alleges they intended to say but did not"); *Healy Law Offs.*, 2025 WL 3724365, at *4 (interpreting lease containing purchase option and noting that the court "cannot change the contract simply because [it] or one of the parties comes to dislike its provisions").

Although Sana insists that the Lease and Exhibit Provisions provided "one integrated option," that argument is belied by the Provisions' plain language. Parts of

17

the Lease and Exhibit Provisions directly conflicted with one another.[20] They established different start dates, different expiration dates, different durations, different scopes of purchase, different parameters for crediting the initial option payment, and different notification methods. *Cf. Healy Law Offs.*, 2025 WL 3724365, at *4 (noting that contract construction requires "giv[ing] effect to all the provisions of the contract"). To the extent that the Lease Provision controlled or that Sana sought to rely upon it, that Provision expired at the end of 2022, before either of Sana's communications.[21] To the extent that the Exhibit Provision controlled or that

---

[20]"[A] contract is not necessarily ambiguous simply because some sections arguably conflict." *Mosaic Baybrook One*, 674 S.W.3d at 256–58. For example, one conflicting provision may be more specific than the other such that "[the] specific contract provision controls over [the] general one." *Id.* (construing seemingly conflicting provisions and concluding that "the specific lease addendum for government fees control[led] over the general agreement to pay for all other utilities and services in paragraph five of the lease"). Whether a contract is ambiguous is a question of law. *Id.* at 257.

[21]Sana argues that Metrocrest should be estopped—based on the doctrines of judicial admission and equitable estoppel—from claiming that the purchase option expired at the end of 2022. According to Sana, Metrocrest's conduct and pleadings represented that the purchase option expired at the end of 2023.

But the statements that Sana points to as judicial admissions were in a prior iteration of Metrocrest's pleadings that, by the time of the summary judgment, had been superseded by amended pleadings. *See* Tex. R. Civ. P. 65; *FKM P'ship, Ltd. v. Bd. of Regents of Univ. of Hous. Sys.*, 255 S.W.3d 619, 633 (Tex. 2008) (recognizing that "amended pleadings and their contents take the place of prior pleadings"). And as for equitable estoppel, Sana does not so much as acknowledge the elements of that defense, much less point to any evidence that it lacked "knowledge or [the] means of obtaining knowledge" of the Lease's terms or that Metrocrest "false[ly] represent[ed] or conceal[ed]" those terms. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 486 (Tex. 2017) (listing elements of equitable estoppel, including "a false representation or

18

Sana sought to rely upon it, that Provision did not authorize a piecemeal purchase. And under either Provision, Sana could not complete the purchase "within ninety days" of giving notice, as its email arguably anticipated under one interpretation. Nor could Sana, under either Provision, reserve a right to purchase portions of the property after the option's expiration or condition its purchase on Metrocrest's replatting at its sole expense. *See id.* at *5 ("[A]cceptance of an option [to purchase] must be unqualified . . . and strictly in accordance with the terms of the agreement."); *Besteman*, 272 S.W.3d at 784 ("Any failure to exercise an option [to purchase] according to its terms, including an untimely or defective acceptance, is simply ineffectual, and legally amounts to nothing more than a rejection."); *cf. FWT*, 301 S.W.3d at 794 (reciting rule that, when exercising a purchase option, "a new demand, proposal, condition, or modification of the terms of the offer is not an acceptance").

In truth, Sana's proposed "harmoniz[ation]" of the Lease and Exhibit Provisions amounts to a Frankenstein-like amalgam of the two. Sana urges us to combine some aspects of the Exhibit Provision (such as the 2023 expiration date) with other aspects of the Lease Provision (such as the option to purchase the property piecemeal) to form a patchwork purchase option that—once supplemented by several

concealment of material facts" being made "to a party without knowledge or means of obtaining knowledge of the facts"). Regardless, as discussed above, the purchase option's expiration date was but one of the many defects in Sana's attempts to exercise its purchase option.

allegedly implied terms (such as the replatting requirement[22])—Sana argues validated its attempts to exercise its purchase option. But no coherent interpretative theory supports Sana's proposed interpretation, and adopting its construction would require us to ignore material terms in each Provision, rendering those terms meaningless. *Cf. Pathfinder Oil & Gas*, 574 S.W.3d at 889 (reciting canon of construction that courts strive to "give effect to all the provisions of the contract so that none will be rendered meaningless"). Meanwhile, under every other rational interpretation of the Lease— including the one informally verbalized by the trial court—Sana's actions did not constitute a valid exercise of its purchase option.

Thus, based on the plain language of the Lease and incorporated Exhibit Provision as well as Sana's failure to challenge all of the legal grounds supporting the trial court's summary judgment ruling, we overrule Sana's dispositive issue.

## IV. CONCLUSION

Having overruled Sana's dispositive issue, we affirm the trial court's summary judgment on Sana's breach of contract claim. And because that is the only portion of

---

[22]Sana's trial court response to Metrocrest's summary judgment motion did not address Metrocrest's argument that Sana's letter had imposed a replatting requirement not authorized by the Lease. Nor does Sana's opening brief address the issue. *See supra* Section III.B.1. But in its reply brief, Sana argues that replatting was Metrocrest's responsibility as the property owner so the letter "did not create new duties or alter the parties' rights[] but merely anticipated routine administrative work associated with transferring a defined portion of a larger campus property." Again, though, "an appellant may not raise new issues in its reply brief." *Madhu Lodging Partners*, 2024 WL 2760482, at *2 n.5; *see supra* note 19.

the judgment challenged on appeal, we affirm the final judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Dana Womack

Dana Womack
Justice

Delivered:  March 12, 2026